# EXHIBIT 1

Clerk of the Superior Court
*** Electronically Filed ***
D. Bicoy, Deputy
4/27/2022 10:07:54 PM
Filing ID 14237806

Erik W. Centner, SBN 035107
16248 N. 38th Way
Phoenix, AZ  85032
Telephone:  (602) 350-6046
*Ecentner2003@gmail.com*
*Attorney for Plaintiffs*

## IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

_____

| | |
|---|---|
| Gina Centner and Paul Paradis,<br>                    Plaintiffs,<br>                    v.<br><br>TMG Utility Advisory Services, Inc. a Texas<br>Corporation and Mario Bauer, individually,<br>                    Defendants. | COMPLAINT<br><br>**CV2022-051320**<br><br>(EMPLOYMENT DISPUTE,<br>FRAUD) |

_____

Plaintiffs, by and through counsel undersigned, for their Complaint hereby alleges as follows:

## **INTRODUCTION**

1.      This is a wrongful termination action arising from retaliatory firings brought by plaintiffs Gina Centner ("Centner") and Paul Paradis ("Paradis") (collectively hereinafter, "Plaintiffs"), against TMG Utility Advisory Services, Inc. ("TMG") and TMG's Chief Executive Officer, Mario Bauer ("Bauer" or "CEO"), pursuant to the Arizona Employment Protection Act, A.R.S. § 23-1501 *et seq.* (the "AEPA").

2.      On or about January 16, 2021, Centner was hired and became employed as TMG's Chief Compliance Officer.

3.      On or about January 2, 2021, Paradis was hired and became employed as TMG's Chief Operating Officer.

4.      On March 24, 2022, Centner and Paradis were both wrongfully terminated by TMG and Bauer in retaliation for having informed TMG and Bauer that Centner and

Paradis had uncovered documentary evidence and therefore developed a reasonable belief that TMG, Bauer and TMG President, Pam Glanvill ("Glanvill") had violated, and were continuing to violate, Arizona Revised Statute § 13-2202 (Deceptive Business Practices), Arizona Revised Statute § 13-2310 (Fraudulent Schemes and Artifices) and Arizona Revised Statute § 44-1522(A) (Unlawful Practices), as well as the deceptive business practice statutes of several other states.[1] Furthermore, Bauer has committed fraud by knowingly and intentionally making a series of materially false representations in TMG's July 28, 2021 Management Representations to Whitley Penn LLP, TMG's auditors, *which are likely to require the withdrawal of Whitley's July 28, 2021 Unqualified Audit Opinion for both 2019 and 2020, as detailed herein*.

5.      Centner and Paradis are not the only TMG C-Suite executives to be wrongfully terminated by TMG and Bauer in a retaliatory manner in the last six months. In September 2021, TMG's then Chief Financial Officer, Anthony Filoso, uncovered financial irregularities and violations of state law by Bauer involving a self-interested transaction engineered by Bauer to pilfer $2 million in valuable TMG assets for Bauer's personal benefit without Bauer having to pay for them.  Filoso reported the matter to Bauer on September 7, 2021.  Bauer, who was solely responsible for all termination decisions, responded by wrongfully terminating Filoso within just a few days in retaliation for Filoso having uncovered and reported Bauer's pilfering of TMG assets for his own personal benefit.

6.      The fact that Bauer retaliated against and wrongfully terminated Filoso, Centner and Paradis within just days after each of them uncovered and reported

---

[1]      As detailed herein, Bauer and Glanvill did so by knowingly, intentionally and falsely representing to TMG's utility customers that TMG: (i) possesses and utilizes the cyber and information security capabilities contractually required of TMG by TMG's utility customers to protect the utilities' data from cyber attacks; and (ii) is "SOC 2" compliant and "SOC 2" certified, despite TMG, Bauer and Glanvill having actual knowledge that TMG has never had -- and therefore never utilized  --  such cyber and information security capabilities and is not -- and has never been "SOC 2" compliant or certified.

violations of state statutes by Bauer and Glanvill involving TMG constitutes a clear pattern and practice of retaliatory behavior and demonstrates that CEO Bauer has repeatedly acted with the "evil mind" required by Arizona law to entitle Centner and Paradis to seek and obtain punitive damages in amounts to be determined at trial.

7.     Plaintiff Centner also alleges a claim against TMG and Bauer for fraudulent inducement arising from Bauer's fraudulent representation, made in his capacity as CEO of TMG, that, in addition to being paid an annual base salary of $200,000 and benefits that included company subsidized insurance benefits, vacation, etc., Centner would also be paid additional compensation.[2]

8.     Bauer knew that such representation was false at the time he made this representation and Bauer intended that Centner would act on Bauer's false representation by accepting employment as TMG's Chief Compliance Officer.  Unaware of the falsity of Bauer's representation, Centner did, in fact, rely on Bauer's representation, accepted employment as TMG's Chief Compliance Officer, performed the duties and responsibilities required of her in that role and was damaged as a result thereof when TMG and Bauer did not pay Centner any additional compensation as Bauer had falsely represented TMG would.

9.     Plaintiff Paradis also alleges a claim against TMG and Bauer for fraudulent inducement arising from Bauer's fraudulent representation, made in his capacity as CEO of TMG, that, in addition to being paid an annual base salary of $300,000 and benefits that included company subsidized insurance benefits, vacation, etc., Paradis would also

---

[2]     *See* Ex. 1 hereto, Bauer's letter of June 30, 2021 to Mr. Ian Dyck confirming the mid-year bonus payment of $300,000 payable to Centner.

be paid additional compensation.[3,4,5]

10.     Bauer knew that such representation was false at the time he made this representation and Bauer intended that Paradis would act on Bauer's false representation by accepting employment as TMG's Chief Operating Officer.  Unaware of the falsity of Bauer's representation, Paradis did, in fact, rely on Bauer's representation, accepted employment as TMG's Chief Operating Officer, performed the duties and responsibilities required of him in that role and as damaged in an amount to be determined at trial as a result thereof when TMG and Bauer did not pay any additional compensation as Bauer had represented TMG would.

11.     A ***TMG Employee and Wage Census*** dated December 31, 2021, evidences the fact that Bauer did, in fact, pay himself a full year bonus totaling $1,100,436.22, but failed to pay Centner and Paradis additional compensation as Bauer had represented they would each be paid in order to fraudulently induce Centner and Paradis into accepting employment with TMG.  *See* Ex. 4 hereto.

## PARTIES

12.     Plaintiff Gina Centner is a citizen and resident of Phoenix, Arizona, County of Maricopa.

13.     Beginning on or about January 16, 2021, Centner became employed as the Chief Compliance Officer of defendant TMG Utility Advisory Services, Inc. by and through TMG's co-employment relationship between TMG and Insperity, Inc.  During her employment with defendant TMG, Centner was assigned to, and did, perform work

---

[3]     *See* Ex. 2 hereto, January 27, 2021 email confirming that "TMG will be making the lease payments directly."

[4]     See Ex. 3 hereto, February 9, 2021 Residential Lease Agreement for property located at 7441 E. Century Drive, Scottsdale, Arizona executed on behalf of TMG and signed by Bauer.

[5]     *See* Ex. 1 hereto, Bauer's letter of June 30, 2021 to Mr. Ian Dyck confirming the mid-year bonus payment of $400,000 payable to Paradis.

4

for TMG in Scottsdale, Maricopa County, Arizona.

14.     Prior to being wrongfully terminated on March 24, 2022, Centner was a highly regarded TMG employee and was repeatedly recognized by Bauer and others in senior leadership positions at TMG for routinely performing extremely high quality work and being an outstanding employee.

15.     Plaintiff Paradis is a citizen and resident of Scottsdale, Arizona, County of Maricopa.

16.     Beginning on or about January 2, 2021, Paradis became employed as the Chief Operating Officer of defendant TMG Utility Advisory Services, Inc. by and through TMG's co-employment relationship between TMG and Insperity, Inc.  During his employment with defendant TMG, Paradis was assigned to, and did, perform work for TMG in Scottsdale, Maricopa County, Arizona.

17.     Prior to being wrongfully terminated on March 24, 2022, Paradis was a highly regarded TMG employee and was repeatedly recognized by Bauer and others in senior leadership positions at TMG for routinely performing extremely high quality work and being an outstanding employee.  In addition, prior to being wrongfully terminated, Bauer had repeatedly informed Paradis that he would continue to be employed as TMG's Chief Operating Offer and was a highly valued part of TMG's senior management team. For example, on December 25, 2021, Bauer texted Paradis and stated, "***Merry Christmas!!  Enjoy the time away because we have a lot to do in 2022!!***"  (Emphasis added).

18.     Defendant TMG Utility Advisory Services, Inc. d/b/a TMG Consulting, Inc. is a Texas corporation that maintains its principal executive offices at 388 Feathergrass Drive, Buda, Texas 78610-8911.  At all times relevant hereto, TMG conducted business out of an office leased by BGPC, Inc., ("BGPC") located at 7524 E. Angus Drive, Scottsdale, Arizona 85251, which is another company owned by Bauer. BGPC was formerly known as TMG Texas, Inc., an entity that acquired, through an assignment, the assets of Synersys Consulting, Inc. and Synersys Consulting, LLC in

September 2020.   BGPC is currently known as TMG Offshore, Inc. ("TMG Offshore"). Defendant Bauer is the sole shareholder of TMG Offshore.

19.   Defendant Bauer is the Chief Executive Officer of TMG and owns fifty-five percent of TMG's common stock, making Bauer the majority and controlling stockholder of TMG.  Bauer is a citizen of the State of Colorado and resident of Parker, Colorado.  During the relevant time period, Bauer travelled to Scottsdale, Arizona on multiple occasions and routinely conducted business within the State of Arizona throughout 2021 and at least until March 24, 2022.

## JURISDICTION and VENUE

20.   This Court has jurisdiction over the parties and this action pursuant to A.R.S. §12-123.

21.   This Court is the proper venue for this action pursuant to A.R.S. §12-401 because the actions giving rise to Plaintiffs' claims occurred in Maricopa County, where Plaintiffs reside.

## SUBSTANTIVE ALLEGATIONS

**Bauer Believes TMG's Computer System Has
Been Hacked and Requests Paradis Lead A Forensic Cyber
Investigation To Determine The Extent of the Cyber Intrusion**

22.   Early on Sunday morning, March 13, 2022, Bauer contacted Paradis and informed Paradis that Bauer believed TMG's computer systems had been compromised after having been hacked in a cyber attack.  Bauer also informed Paradis that Bauer believed that the cyber attack on TMG's computer systems had initiated from the laptop computer used by TMG's founder, Gregory Galluzzi ("Galluzzi"), to perform work for TMG's utility clients.  *See* Ex. 5 hereto.

23.   During their initial conversation on March 13th, Bauer instructed Paradis to initiate and lead a forensic cyber security investigation to determine the extent and scope of the hack and intrusion into TMG's computer environment and whether any of TMG's utility customers' data or information had been accessed or compromised by the

hacker(s).

24.     Bauer was extremely upset over what he believed to be a cyber intrusion into TMG's computer systems and had at least 8 telephone conversations with Paradis on Sunday, March 13th.  At some point, Bauer and Paradis discussed the fact that Bauer was in the process of negotiating a $40+ million sale of TMG to a publicly traded company based in Nashville named i3 Verticals, Inc., ("i3")[6] and that, if news of the suspected hack leaked to i3 management with whom Bauer was negotiating, i3 could stop negotiating the purchase of TMG altogether.

**The Forensic Cyber Security Investigation**
**Of TMG's Computer System Is Conducted**

25.     From Sunday, March 13, 2022 through Wednesday, March 16, 2022, Paradis worked with cyber security experts to initiate and lead the forensic cyber security investigation that Bauer had requested.  In connection with this forensic cyber security investigation, system-generated informational data was obtained and reviewed and internal TMG documents and TMG's contracts with utility customers were reviewed. Additionally, certain witnesses were interviewed.

**The Forensic Investigation and Review of TMG's**
**Contracts With Numerous Utility Clients Reveal That**
**TMG, Bauer and Glanvill Have Long Been Engaged**
**In Defrauding TMG's Utility Clients Concerning TMG's**
**Purported Cyber and Information Security Capabilities**

26.     Work performed during the forensic cyber investigation of TMG's computer systems produced documentary evidence demonstrating that ***TMG does not possess, and has never possessed, the cyber and information security capabilities contractually required by TMG's utility clients***.  This forensic investigation also

---

[6]     According to its public SEC filings, i3 Verticals, Inc. is a publicly traded company that delivers integrated payment and software solutions to customers in strategic vertical markets that include Public Sector, Healthcare and Education.

generated evidence that conclusively demonstrates that TMG, Bauer and Glanvill have long falsely represented that TMG does, in fact, possesses and utilize the cyber and information security capabilities contractually required by TMG's utility clients despite having actual knowledge that TMG does not have or utilize any such capabilities.

27.     Based on information learned about TMG's extreme lack of cyber and information security capabilities during the course of the forensic cyber investigation, Paradis met and conferred with Centner concerning the express cyber and information security related contractual requirements imposed on TMG by the majority of TMG's utility customers.

28.     Because the forensic investigation had revealed that TMG lacked even the most basic cyber and information security capabilities, Paradis requested that Centner, as TMG's Chief Compliance Officer, investigate the express contractual requirements that TMG's utility customers required TMG to comply with concerning both cyber and information security capabilities.

29.     Based on a review of several of TMG's contracts with TMG's utility customers across the United States, Centner confirmed that TMG, Bauer and Glanvill have long been engaged in "deceptive business practices" and employed "fraudulent schemes and artifices" to fraudulently induce TMG's utility clients to contract with TMG by falsely representing that TMG possesses the cyber and information security capabilities that are contractually required by TMG's utility customers when, in fact, Bauer and Glanvill have long had actual knowledge that TMG did not – and does not.

30.     The following sampling of contracts with TMG utility customers demonstrates this fact clearly.  For example:

     **A.**     **EPCOR Utilities, Inc.**

31.     On October 1, 2018, TMG entered into a "Professional Services Contract" with EPCOR Utilities, Inc. ("EPCOR").  The term of this contract began on October 1, 2018.  *See* Ex. 6 hereto at 2.  According to EPCOR's website, "EPCOR is the largest regulated professional water company in Arizona."  *See*

https://www.epcor.com/about/news-announcements/Pages/epcor-completes-brooke-water-acquisition.aspx.

32.　　The Professional Services Contract that TMG entered into with EPCOR contains a "Schedule A".  Item A4 is entitled, "Special Provisions," and states in relevant part:

> A-4.　　***The parties agree that the following special provisions will apply to the provision of the Services***:
>
> A-4.1 **Security**
>
> *　　*　　*
>
> ***The Contractor [TMG] shall maintain systems and applications in a manner that ensures they are protected from known vulnerabilities and malware.  This includes, but is not limited to, maintaining,*** without reasonable delay, firewall, intrusion detection, ***antivirus protection, security patches, operating system patches and service packs, and application releases to current levels.***
>
> *　　*　　*

(Ex. 6 at 4-5).  (Emphasis added).

33.　　At the time Bauer executed the Professional Services Contract with EPCOR as the CEO of TMG, Bauer had actual knowledge that TMG did not satisfy this "special provision" of the contract with EPCOR.  Bauer also had actual knowledge that TMG could not satisfy this contractual requirement because he knew that TMG did not monitor or control whether TMG's employees or contractors working on the EPCOR contract utilized or maintained any anti-virus protection on the computers that they used to perform the work for EPCOR.  Bauer also knew that TMG did not monitor or control whether TMG's employees or contractors working on the EPCOR contract applied "security patches, operating system patches and service packs, and application releases to current levels," as the EPCOR contract required.  Finally, Bauer also knew that no TMG employee or contractor was charged with the responsibility for monitoring or checking whether the individuals assigned to work on this EPCOR contract satisfied

9

these contractual requirements.

34.     Despite knowing that TMG did not, and could not, satisfy these very explicit contractual requirements, Bauer nevertheless knowingly and intentionally defrauded EPCOR by causing TMG to enter into the contract with EPCOR with the intention of deceiving EPCOR into believing that TMG did satisfy these contractual requirements.

35.     By engaging in this conduct, Bauer and TMG engaged in conduct that constituted a "deceptive business practice" in violation of Arizona Revised Statute § 13-2202 and employed a "fraudulent scheme and artifice" in violation of Arizona Revised Statute § 13-2310.

## B.     Colorado Springs Utilities

36.     On or about November 6, 2020, TMG entered into a "Professional Services Agreement" with Colorado Springs Utilities ("CSU"), that had a term beginning on November 5, 2020, with four one-year renewal options at the sole discretion of CSU. *See* Ex. 7 hereto at 2.

37.     The Professional Services Agreement that TMG entered into with CSU contains "**Exhibit Z: Data Security Rider**," and states in relevant part:

> CONTRACTOR acknowledges and agrees that data and information to be provided to CONTRACTOR  . . . or used by CONTRACTOR during performance of this Agreement is categorized as Confidential Information under this Agreement . . . .   The following requirements apply to applications  . . . and all devices and infrastructure to be connected to the UTILITIES network or that otherwise document, contain, or process UTILITIES' information on the UTILITIES' network or accessed through other means:
>
> *     *     *
>
> **B.     Audits and Cyber Security Testing**
>
> 1.     UTILITIES has the right to audit and/or test applications and devices delivered hereunder prior to acceptance and periodically thereafter during performance of this Agreement.

10

2. CONTRACTOR agrees to undergo such acceptance and periodic security audits by certified third parties occurring at least annually.  Any identified issues must be resolved within ninety (90) days of the date of the audit report. UTILITIES may request, and CONTRACTOR shall provide, a copy of the results of this audit at any time during the performance of this Agreement.  The initial acceptance audit requirement may be satisfied by providing a SSAE 16 or 18 or SOC 2 Type 2 report or equivalent, and such report shall also be provided to UTILITIES annually. CONTRACTOR also agrees to provide a SOC 1 Type 2 report annually.

*  *  *

## C. Security-related Patches and Maintenance

As soon as reasonably possible after they are tested and determined to be safe for installation, but not to exceed 30 days from issuance, CONTRACTOR agrees to apply patches to systems/solutions that comprise the service(s) that they provide and systems/solutions they manage on behalf of UTILITIES for "critical" software / firmware vulnerabilities that are revealed and addressed by a supported patch. CONTRACTOR will categorize the urgency of the application as either "critical" or "non-critical" in nature based on industry recommendations and applicability to their product / solution . . . .

*  *  *

## F. Data Storage, Replication and Backup

CONTRACTOR shall backup all UTILITIES' data from the production server for data recover purposes.  In addition, COTRACTOR shall also backup all UTILITIES' data to a separate geographically isolated location for disaster recovery purposes.  UTILITIES' data shall be stored for a minimum of thirty (30) days at the production facility and at the disaster recovery facility for a minimum of ninety (90) days.

*See* Ex. 7.

38. At the time Bauer executed the Professional Services Contract with CSU as the CEO of TMG, Bauer had actual knowledge that TMG: (i) was not "SOC 2" compliant or "SOC 2" certified; (ii) did not timely test or apply security-related patches

11

as required by the CSU contract; (iii) did not timely perform security-related maintenance as required by the CSU contract; and (iv) did not have the capability to backup and replicate data to a "separate geographically isolated location for disaster recovery purposes."

39.     The fact that TMG has never been "SOC 2" compliant was also confirmed by the accounting firm of Grant Thornton, LLP ("Grant Thornton") in May 2021.  On May 27, 2021, Grant Thornton provided TMG and Bauer with a PowerPoint presentation entitled, "*TMG Consulting SOC 2 Readiness Assessment Results*."  See Ex. 8.

40.     Grant Thornton's *SOC 2 Readiness Assessment Results* informed TMG and Bauer that **Grant Thornton had evaluated "62 unique control activities" and identified "46 control weaknesses**."  Significantly, **Grant Thornton opined that, "of the 46 weaknesses, 42 were rated as "High" and 4 were rated as "Medium**."  *Id*. at 8. (Emphasis added).    In explaining the "Severity Legend," Grant Thornton stated in relevant part,

> "**High (control gap) – No control activity exists, this preventing the achievement of the SOC 2 Trust Services Criteria**.  Control identification, changes, updates, and remediation are required immediately.

*Id*. at 8. (Emphasis added).

41.     Despite knowing that TMG did not, and could not, satisfy CSU's very explicit contractual requirements, Bauer nevertheless knowingly and intentionally defrauded CSU by causing TMG to enter into the contract with CSU with the intention of deceiving CSU into believing that TMG did satisfy these contractual requirements.

42.     By engaging in this conduct, Bauer and TMG engaged in conduct that constituted a deceptive trade practice in violation of CRS 6-1-105.

43.     Evidencing her deliberate participation in TMG and Bauer's long-running deceptive business practice scheme involving CSU, Glanvill intentionally misled CSU Analyst Eddie Howard on April 5, 2022 when Analyst Howard once again inquired as to when TMG would provide CSU with TMG's "SOC 2" certification report and Glanvill

falsely stated, "we had to make changes to the auditing firm, but hope to get the information back to you shortly."  In reality, however, Glanvill was well aware her statement was false because Glanvill knew that TMG had not yet remediated *any* of the "46 Control Weaknesses" identified by Grant Thornton in May 2021, and TMG could not begin the "SOC 2" audit process until *after* TMG had remediated all 46 of these Control Weaknesses.

### C.    Portland General Electric Company

44.    In March 2021, Glanvill reported that TMG was "looking to do some work with this account" and that Glanvill "needed a quick review" of the Portland General Electric Company's ("PGE") "Master Purchase Agreement For Goods and Services." *See* Ex. 9.

45.    "Exhibit F" to this PGE "Master Purchase Agreement For Goods and Services" is titled, "**INFORMATION SAFEGUARDS, SECURITY AND PRIVACY STANDARDS ADDENDUM**" and states in relevant part:

> This Addendum sets forth the protocols that Contractor [TMG] agrees to follow with respect to maintaining the security and privacy of . . . "PGE Assets" in connection with the delivery or receipt of equipment, hardware, software, deliverables, systems, and/or the performance or receipt of services under the Agreement or other document (the "**Agreement**").
>
> \*      \*      \*
>
> "**Contractor's Information Systems**" means Contractor's and Contractor Professionals' operating systems, infrastructure, applications, hardware, software and media used to handle, tore, Process or transfer PGE Assets or provide Deliverables to PGE.
>
> "**Contractor Professionals**" collectively refers to employees, contractors, subcontractors, service providers and agents of Contractor that have access to PGE Assets.
>
> \*      \*      \*
>
> [C]ontractor represents and warrants that the security measures it takes in performance of its obligations under the Agreement and this Addendum

13

are, and will at all times meet the following: (i) Privacy & IT Security Best Practices (as defined by ISO 27001/27002); (ii) the security requirements, standards, obligations, specifications and event reporting procedures in the Agreement and this Addendum; . . . and (iv) any security requirements, standards, obligations, specifications and event reporting procedures required by any law, including, but not limited to, Oregon Revised Statute 646A.600 et seq. **Contractor represents and warrants that Contractor and all Contractor Professionals are capable of performing, and are, as of the date of the Agreement, in compliance with this Addendum.**

\*          \*          \*

**16.      Contractor Security Program Compliance.** *Contractor will, on an ongoing basis, ensure that its information security program is designed, maintained, updated and adjusted, as necessary, to protect against reasonably forseeable internal and external risks to the security, confidentiality and integrity of PGE Assets and Deliverables that could result in the unauthorized access, disclosure, misuse, alteration, destruction, or other compromise of such PGE Assets. Contractor will regularly assess, test, and monitor the effectiveness of the information security program's key controls, systems, and procedures.* Without limiting the foregoing:

16.1 *Contractor will, and will cause Contractor Professionals to, perform regular vulnerability scans of all Contractor Information Systems* using an industry standard vulnerability scanner at reasonable intervals, but *in no event less frequently than once per quarter*.

16.2 *Contractor will have an accredited third party hired by Contractor, perform a security and privacy design review and penetration test of Contractor's Information Systems* as circumstances reasonably require, but *in no event less frequently than once per year*.

16.3 *Contractor will perform annual audits of Contractor's security and privacy controls to protect PGE Assets* using (1) an appropriate audit standard for management of information systems and a mutually agreed upon audit scope that is applicable to the Deliverables; and applied to all relevant services, systems, devices, and media and all material controls applicable to PGE Assets, and (2) an accredited, third party audit firm hired by Contractor and approved by PGE, which shall not be unreasonably withheld.

16.4 *Contractor shall annually ensure performance of internal controls SSAE 16 (SOC 1 and SOC 2) / ISAE 3402 Type II audit and Contractor will provide a copy of the final report to PGE.* Additionally,

14

during the term of the Agreement and ***no more than twice per year PGE may request from Contractor a bridge letter with respect to the SSAE 16 (SOC 1 and SOC 2) / ISAE 3402 Type II Reports*** and/or any other applicable reports that Contractor may produce. . . .

See Ex. 9.  (Bold in original, Bold and Italics added).

46.     Despite knowing that TMG did not, and could not, satisfy PGE's very explicit contractual requirements, Bauer and Glanvill nevertheless knowingly and intentionally defrauded PGE by causing TMG to falsely represent and warrant to PGE that: (i) TMG and all of TMG's employees and contractors were "capable of performing, and are, as of the date of the Agreement, in compliance with this Addendum"; (ii) TMG had the "information security program" required by the PGE contract when, in fact, it did not and does not; (iii) TMG's employees and contractors performed "regular vulnerability scans" of all TMG Information Systems when, in fact, they did not and do not; (iv) TMG hired an accredited third party to perform "privacy design review and penetration test" of TMG Information Systems annually when, in fact, it did not and has not; and (v) TMG was SOC 2 compliant when, in fact, it was not and is not.

47.     By engaging in this conduct, Bauer, Glanvill and TMG engaged in conduct that constituted an unlawful trade practice in violation of ORS 646.607.

### D.     Tampa Electric Company

48.     Tampa Electric Company is a customer of TMG.  *See* Ex. 10.

49.     The 2021 "***Services Agreement Between Tampa Electric Company and TMG Consulting***" states in relevant part:

**28.     DATA PROTECTION AND PERSONAL INFORMATION**

[C]onsultant and Company have each implemented and shall maintain an information security program including reasonable administrative, technical and physical measures designed to secure and protect the confidentiality, integrity and availability of all information while in such Party's possession against unauthorized, unlawful or accidental access, disclosure, transfer, destruction, loss or alteration . . . .

*Id*.

50.     Despite knowing that TMG did not have ***any*** "information security

15

program" – let alone a program that met the contractual requirements imposed by the Tampa Electric Company contract, Bauer nevertheless knowingly and intentionally defrauded Tampa Electric Company by causing TMG to falsely represent to Tampa Electric Company that TMG had implemented and maintained the "information security program" required by Tampa Electric Company when, in fact, TMG had not done so.

51.     By engaging in this conduct, Bauer and TMG engaged in conduct that constituted a deceptive and unfair trade practice in violation of Florida Statutes 501.201 – 501.213.

52.     After reviewing each of the aforementioned contracts, Centner informed Paradis that, based on the facts that had been learned during the forensic cyber investigation and a review of numerous TMG utility customer contracts with TMG, it was clear that TMG did not – and could not – satisfy the contractual requirements imposed by several of TMG's utility customers concerning both cyber and information security capabilities.

53.     On Thursday, March 17, 2022, Paradis participated in an 8:00 am Microsoft Teams meeting videoconference with Bauer, TMG's President Pam Glanvill, and Mr. Rocco Valenti, the lead cyber security engineer with whom Paradis had worked on the forensic cyber security investigation involving TMG and Galluzzi.

54.     During this conversation, Paradis and Valenti informed Bauer and Glanvill about several of the following high-level investigatory findings and noted that the virtually non-existent cyber hygiene associated with TMG's Active Directory had created a serious cyber security risk to TMG.   Statistics and system-generated information obtained during the forensic cyber investigation make clear that the cyber and information security measures that TMG's clients have long required TMG to possess and utilize pursuant to their contracts with TMG to protect utilities' data from cyber attacks do not exist at TMG.  *See* Ex. 11.

55.     The forensic investigation also confirmed that TMG employs a "Bring Your Own Device" ("BYOD") policy, pursuant to which every TMG employee and

contractor utilizes their own computer and software when performing work for TMG's utility clients. Because of this, TMG has no control over the computers and other devices that TMG contractors and employees use to perform work for TMG's utility clients – utilities who own and operate much of the nation's critical electrical grid, water and gas delivery infrastructure. TMG employee Brooks Yates ("Yates") confirmed that TMG is, therefore, unable to determine what, if anything, each TMG employee and contractor is doing to assure TMG's utility clients that their critical data is protected from potential cyber and ransom ware attacks.

56.     Simply stated, Mr. Yates confirmed that TMG has no way of knowing whether the computers and other electronic devices that TMG's employees and contractors use to perform work for TMG's utility clients are: (i) protected by any anti-virus software at the device level; (ii) periodically scanned to identify the presence of known cyber security vulnerabilities; (iii) properly configured and routinely patched to harden these devices against known cyber security vulnerabilities; or (iv) configured to log incidents that can be forensically analyzed if necessary. Equally troubling is TMG's failure to assign any TMG employees or contractors the responsibility for managing TMG's cyber and information systems risks on a full time basis.

57.     These facts are particularly troubling given that the "tmgconsulting.com" domain email addresses of TMG's founder, Greg Galluzzi and his email password, along with defendant Bauer's email address and email password, were both identified as having been involved in a number of data breaches and are freely available online – along with the "tmgconsulting.com" email addresses and corresponding passwords for five additional TMG employees. The available email addresses and passwords are as follows:

| **"TMGConsulting.com" Email Address** | **Password** |
|---|---|
| garyg@tmgconsulting.com | ka_dJKHJsy6 |
| greg.galluzzi@tmgconsulting.com | ladydog1 |
| klaux@tmgconsulting.com | Laux4360 |
| davids@tmgconsulting.com | bella123 |

mariob@tmgconsulting.com          Zigzag01
gregg@tmgconsulting.com           mrzipper99
pwyman@tmgconsulting.com          sox1pats1

58.     Because of TMG's utter lack of cyber and information security capabilities and reckless disregard for protecting the Company's own information and data – let alone that of its utility customers who own and operate much of the nation's critical power, water and gas delivery infrastructure, anyone capable of conducting an internet search using a common search engine could have obtained and utilized the email passwords for TMG's CEO (Bauer) or TMG's founder (Galluzzi) to access each of their email accounts where both Bauer and Galluzzi save and maintain a wide variety of highly confidential utility customer data and information.  Moreover, because both of their TMG company email passwords were readily available online, cyber attackers could have accessed both of their email accounts without either Bauer or Galluzzi having any idea that their TMG email had ever been accessed.

59.     Finally, the forensic cyber investigation also confirmed that, despite TMG having been the victim of a successful cyber attack/hack in March of 2021 that resulted in TMG's Accounting Department paying a fraudulent $50,000 invoice, Bauer and Glanvill had failed to heed the Cyber Security Expert's advice and failed to implement Multi-Factor Authentication on a company-wide basis as they expressly had been instructed to do in March of 2021.  This fact is confirmed by Ex. 12 hereto, which illustrates that, as of March 2022 – one year after the successful $50,000 cyber attack involving TMG's Accounting Department, ***Multi-Factor Authentication has not been "Enabled" for an astounding 63.95% of TMG's employees and contractors***.

60.     Thereafter, Bauer requested that Paradis prepare and provide a written memorandum stating these high-level findings and making recommendations to address the lack of cyber and information security capabilities at TMG.  Paradis drafted and provided Bauer and Glanvill with the requested Memorandum on March 18, 2022.  *See* Ex. 13 hereto (the "March 18th Memorandum").

18

61.     When Paradis had previously pointedly asked Bauer why Bauer and Glanvill had repeatedly caused TMG to enter into contracts with numerous utility clients that contained express cyber and information security requirements that TMG has never satisfied, Bauer replied by stating words to the effect:

> ***none of the utilities ever bother to check to see if we comply with that boilerplate security related language, so I am not worried about it.  I know we don't satisfy those requirements – but since no one ever asks or checks, it is a risk that I am willing to take.  If we get caught, I will deal with it then – in the meantime, we are making big money.  Besides, we are not the only ones who don't comply – none of our competitors comply either and none of us have ever been caught.  The utilities need us.***

(Emphasis added).

**Evidence Uncovered During the Forensic**
**Cyber Investigation Also Confirmed That**
**Bauer Made Material Misrepresentations**
**To TMG's Auditors, Whitley Penn LLP**

62.     On July 28, 2021, Whitley Penn LLP issued an unqualified audit opinion concerning the consolidated financial statements for TMG Utility Advisory Services, Inc. d/b/a TMG Consulting (hereinafter "TMG" or the "Company") for the years ended December 31, 2019 and 2020 ("Whitley's Unqualified Opinion").

63.     Evidence uncovered during the forensic cyber investigation revealed that Bauer knowingly made a number of materially false representations to Whitley Penn LLP in TMG's July 28, 2021 Management Representation Letter, which are likely to require the withdrawal of Whitley's July 28, 2021 Unqualified Opinion for both 2019 and 2020.

64.     The materially false representations made by TMG CEO Bauer in TMG's July 28, 2021 Management Representation Letter include:

- We have no knowledge of any fraud or suspected fraud that affects the entity and involves:

    - Management;

19

-        Employees who have significant roles in internal control; . . .

*        *        *

•        We have disclosed to you all known instances of noncompliance or suspected noncompliance with laws and regulations whose effects should be considered when preparing financial statements.

*        *        *

•        There are no:

-        Violations or possible violations of laws or regulations whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency. . . .

*        *        *

•        We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

*        *        *

•        We have complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.

65.        The evidence uncovered by the forensic cyber investigation confirms that Bauer made the foregoing material misrepresentations on which Whitley Penn relied in issuing its Unqualified Audit Opinion of July 28, 2021, because Bauer and Glanvill have knowingly been engaged in the deceptive business practices and employed schemes to defraud TMG's utility customers as detailed herein since at least 2018.

66.        The vast majority of TMG's utility customers are concerned about ensuring that TMG and other vendors hired by these utilities store and maintain the utilities' data in a manner that utilizes information security best practices and protects

the utilities' data from cyber attacks.   As a result, these utilities impose express contractual requirements on TMG concerning TMG's cyber and information security capabilities and require that TMG comply with these stringent contractual requirements in order to do business with these utilities.

67.     Contrary to the representations made by Bauer in TMG's July 28, 2021 Management Representations to Whitley Penn, TMG, Bauer and Glanvill have long knowingly engaged in deceptive business practices, employed fraudulent schemes and artifices and committed consumer fraud, in violation of Arizona Revised Statute § 13-2202, Arizona Revised Statute § 13-2310, Arizona Revised Statute § 44-1522(A), Colorado Revised Statute §6-1-105 and similar statutes in a variety of other states, to defraud TMG's utility clients across the United States concerning TMG's purported cyber security and information security capabilities.

68.     For example, on or about October 1, 2018, TMG entered into a Professional Services Contract with Scottsdale, Arizona based EPCOR Utilities, Inc. The EPCOR Contract was signed by Bauer.

69.     At the time Bauer executed the EPCOR Contract as the CEO of TMG on or about October 1, 2018, Bauer had actual knowledge that TMG did not satisfy the contractual requirements imposed on TMG under Section A-4 of SCHEDULE A to the EPCOR Contract, because Bauer knew that TMG did not maintain its systems and applications in the manner contractually required by Section A-4.1 of the EPCOR Contract.

70.     Notwithstanding Bauer's knowledge, Bauer nevertheless executed the EPCOR Contract as CEO of TMG and falsely represented to EPCOR that TMG satisfied these cyber and information security related contractual requirements.   By doing so, Bauer recklessly sold mislabeled services to EPCOR and thereby committed a deceptive business practice in violation of ARS § 13-2202.  In addition, by engaging in this scheme to defraud EPCOR, Bauer knowingly obtained a benefit for TMG, himself and Glanvill by means of false representations and promises, namely falsely representing that TMG

21

satisfied the express contractual requirements demanded by EPCOR in Section A-4.1 of the EPCOR Contract, and thereby also violated ARS § 13-2310 and ARS § 44-1522(A).

71.     Similarly, on or about November 6, 2020, Bauer caused TMG to enter into a Professional Services Agreement with Colorado Springs Utilities.  The CSU Contract was signed by Bauer and expressly incorporated "Exhibit Z: Data Security Rider."

72.     At the time Bauer executed the CSU Contract as the CEO of TMG on or about November 6, 2020, Bauer had actual knowledge that TMG did not satisfy the contractual requirements imposed on TMG under "Exhibit Z: Data Security Rider" to the CSU Contract, because Bauer knew that TMG: (i) was not SOC 2 certified and therefore could not provide CSU with a SOC 2 Type 2 Report as required by the CSU Contract; (ii) did not perform the systems / solutions patching and maintenance required by the CSU Contract; and (iii) did not perform the data backup "to a separate geographically isolated location for disaster recovery purposes," as required by the CSU Contract.

73.     Notwithstanding Bauer's knowledge, however, Bauer nevertheless executed the CSU Contract as CEO of TMG and falsely represented to CSU that TMG satisfied CSU's contractual requirements relating to SOC 2, data backup and information security.  By doing so, Bauer knowingly made false representations about TMG and the standard, quality, and/or grade of TMG's services.

**Bauer Misappropriated $2 Million In Valuable TMG Assets to Himself, Personally, By Causing TMG To "Sell" Bauer TMG Offshore and the** <u>**Synersys Assets For A Mere Fraction Of Their True Worth**</u>

74.     In June 2020, TMG purchased certain assets from Synersys Consulting, LLC and Synersys Consulting, Inc. (collectively, "Synersys" and the "Synersys Assets") for a purchase price of $2 million.

75.     In September 2020, TMG assigned all rights in the Synersys Assets to TMG Texas, a corporation now known as TMG Offshore.  At this time, TMG was the

1   majority shareholder of TMG Offshore, Inc.

2       76.     Within just a few months after TMG had purchased the valuable Synersys

3   Assets for $2 million, Bauer breached his fiduciary duties to TMG and TMG's minority

4   stockholders (including Cochise Capital) by selling the valuable Synersys Assets and

5   TMG Offshore to Bauer, personally.  Bauer did so by falsely informing both Mr. Shiv

6   Grewal, TMG's Board Member from Cochise Capital and TMG's auditor, Whitley Penn,

7   that TMG "was considering a shift in strategy" that would involve exiting the offshore

8   software coding business that constituted the day-to-day business activities of TMG

9   Offshore.   Bauer informed Director Grewal and Whitley Penn that, in order to

10  accomplish this "shift in strategy," TMG had determined to sell off all of its interest in

11  TMG Offshore and the Synersys Assets that TMG had acquired in June 2020.

12      77.     In reality, however, nothing could have been further from the truth.  At the

13  time Bauer made these false statements to Director Grewal and Whitley Penn, Bauer and

14  Glanvill were actively seeking to ***expand*** TMG Offshore's business activities and had

15  gone so far as to hire CapMan Consulting, a Manila based employment recruiting agency

16  ("CapMan") and instructed CapMan representatives that Bauer was immediately seeking

17  to hire several senior software engineers and senior solutions functional designers.

18  Bauer and Glanvill constantly pressed to hire as many potential candidates as possible.

19  CapMan responded by providing numerous candidates. Far from exiting the offshore

20  software coding business as Bauer fraudulently represented, Bauer and Glanvill

21  continued to expand TMG Offshore's employee roster and grow its offshore software

22  coding business.

23      78.     In fact, after having falsely represented that TMG's purported "shift in

24  strategy" involved exiting the offshore coding business, Bauer and Glanvill: (i) instituted

25  an across the board thirty percent (30%) pay increase to retain these offshore coding

26  personnel; (ii) provided the offshore coding personnel with greatly enhanced

27  employment benefits by purchasing and providing group life insurance for all these

28  employees; and (iii) went so far as to purchase every one of them a new Apple iWatch

23

as a year-end holiday gift to help minimize the likelihood these valuable employees would be poached by competitors looking to hire additional software coding personnel.

79.     Bauer secreted his wrongful plan to personally purchase TMG Offshore and the Synersys Assets from TMG for a mere fraction of the $2 million that TMG had paid for them in September 2020 from both Cochise Capital and Whitley Penn.  Bauer continued to mislead both Cochise Capital and Whitley Penn into believing that TMG Offshore and the Synersys Assets had little to no value and that Bauer was doing both TMG and its minority stockholder, Cochise Capital, a favor by personally offering to buy 100% of TMG Offshore and the Synersys Assets for $341,404.00 – approximately 17% of what TMG had paid for these very valuable assets just a few months earlier.

80.     Adding insult to injury, when Bauer did finally execute on his plan and did personally acquire  100% ownership of TMG Offshore and all of the valuable Synersys Assets as of January 1, 2021 for a mere fraction of their true worth -- and ***$1,658,596.00 less than what TMG had paid for these valuable assets only months earlier*** -- Bauer further engineered the fraudulent transaction so as to avoid even having to pay any portion of the $341,404.00 purchase price that Bauer falsely claimed was "fair" to TMG and TMG's minority stockholders, including Cochise Capital.  Bauer did so by structuring a series of illusory payments that Bauer was purportedly required to make in order to pay the $341,404.00 purchase price as follows: (i) ten percent ($34,140.00) payable by Bauer by May 21, 2021; (ii) payment of the remaining $307,264.00 by a Note Payable from Bauer with the first installment payment of $153,631.91 plus interest due to be paid by Bauer on December 31, 2021 and the second installment payment of $153,631.91 plus interest due to be paid by Bauer on December 31, 2022.

81.     A search of TMG's corporate books and records, however, will likely demonstrate that Bauer failed to pay both the initial $34,140.00 payment and the first installment of the Note Payable in the amount of $153,631.91.  Stated another way, Bauer wrongfully acquired personal ownership of TMG Offshore and the Synersys Assets that were purchased by TMG using $2 million of TMG corporate funds in

September 2020 ***without personally paying any amount of money whatsoever*** and Bauer has successfully defrauded both Cochise Capital and Whitley Penn concerning this fraudulent scheme.

82.     A very recent March 10, 2022 email authored by Bauer provides irrefutable proof that Bauer deliberately lied to Whitley Penn and minority stockholder, Cochise Capital, when Bauer informed both of them that TMG was divesting itself of TMG Offshore and the Synersys Assets because these Assets had very little value. Bauer's March 10th email states in relevant part, "***TMG (core and off-shore [Synersys]) are growing fast . . . .   I'm being approached by everyone to buy . . . .***"  (Emphasis added).

**Bauer Caused TMG To Falsify The Company's**
**Financial Books and Records By Fraudulently Causing**
**TMG To Record A Fictitious  "Impairment Loss" of $1.65 Million**

83.     As a result of Bauer having personally acquired ownership of all of the valuable TMG Offshore and the Synersys Assets for a mere 17% of the $2 million purchase price that TMG paid for those assets in June 2020, TMG was caused to record a fictitious "impairment loss" of $1,658,596.00 on TMG's financial books and records.

84.     This "impairment loss" had the effect of fraudulently reducing the value of the TMG Offshore and the Synersys assets on TMG's Balance Sheet by $1,658,596.00 because the Synersys Assets were never truly "impaired" as Bauer had falsely claimed and reported to Director Grewal and Whitley Penn.  In reality, the exact opposite is true because the value of the Synersys Assets has actually increased above the $2 million that TMG had paid for them in June of 2020 and there are several entities that have expressed strong interest in buying the Synersys offshore coding business.

85.     By fraudulently causing TMG to record a fictitious "impairment loss" of $1,658,596.00, Bauer breached his fiduciary duty to TMG and to the minority stockholders of TMG, including Cochise Capital, because Bauer caused TMG to artificially understate the true value of the Synersys Assets by $1.6 million and thereby

artificially depressed the value of TMG.

**Centner and Paradis Are Wrongfully Terminated**

86.     On March 24, 2022, Centner and Paradis were wrongfully terminated by TMG and Bauer in retaliation for having informed TMG and Bauer of the facts underlying Centner and Paradis' reasonable belief that TMG had violated numerous Arizona statutes, as well as the deceptive business statutes of several other states.

87.     Defendants' conduct toward Plaintiffs Centner and Paradis, as detailed herein, constituted retaliatory wrongful termination, which is prohibited by A.R.S. § 23-1501(A)(3)(c)(ii).

**Centner and Paradis Were Greatly
Damaged By Defendants' Misconduct**

88.     Centner was damaged by Defendants' misconduct in an amount to be determined at trial.

89.     Paradis was damaged by Defendants' misconduct in an amount to be determined at trial.

**Because Bauer and TMG Have Engaged In
A Pattern And Practice of Retaliatory Firings,
Centner and Paradis Are Entitled To Punitive Damages**

90.     Centner and Paradis are not the first TMG employees to be wrongfully terminated by Bauer and TMG.

91.     On or about September 7, 2021, TMG's former Chief Financial Officer, Anthony Filoso, uncovered financial irregularities arising from the self-interested transaction involving Bauer's acquisition of assets with a true value of at $2 million from TMG for a mere $341,404.00, 17% of what TMG had paid for those assets just three months earlier.

92.     When CFO Filoso saw fit to document the irregularities in an email of that same date and questioned Bauer about this fraudulent transaction, Bauer's temper

exploded. Bauer immediately ordered Filoso to stop creating written evidence of Bauer's fraud and directed Filoso to "***take this [conversation] off-line***."  (Emphasis added).

93.     Despite Filoso having performed very high quality work during his brief tenure as TMG's CFO, Bauer then wrongfully terminated Filoso in retaliation for Filoso having uncovered Bauer's misconduct and confronting Bauer about it.  Filoso's tenure as CFO lasted a mere ten (10) days beyond September 7th – the date on which Filoso confronted Bauer about Bauer's illegal activities.  Filoso's last day as TMG's CFO was September 17, 2021.

94.     Bauer replaced CFO Filoso, who had more than twenty-five years of experience in both public and private accounting, with Kathryn Byczkowski, a CPA with only three years of experience in public accounting as an auditor and appointed her as "Controller" of TMG in December 2021 with a promise that she would soon become TMG's CFO.  Tellingly, Bauer hired Ms. Byczkowski as Controller despite having been advised against doing so by a very senior CPA and attorney in Grant Thornton's New York City Office who interviewed Ms. Byczkowski at Bauer's request to evaluate whether she possessed the skills and experience required by TMG.  After having been advised ***not to hire*** Ms. Byczkowski because she lacked both the skills and experience required by TMG, Bauer nevertheless hired her as TMG's Controller and commented to Plaintiffs Centner and Paradis and others at TMG that Bauer had hired Ms. Byczkowski because she "used to babysit my kids" and "I know she will never try to cross me like Filoso did."

95.     Bauer has clearly engaged in a pattern and practice of systematically terminating TMG employees who have uncovered, questioned or criticized Bauer or TMG for engaging in wrongful conduct.

96.     By doing so, Bauer and TMG acted with the requisite "evil mind," required by Arizona law to entitle Plaintiffs Centner and Paradis to seek and be paid punitive damages in an amount to be determined at trial.

## COUNT I

### (On Behalf of Plaintiff Centner for Violation of Arizona Revised Statute ARS § 23-1501(A)(3)(c)(ii) Wrongful Termination – Retaliatory Firing Against All Defendants)

97.     Plaintiff Centner incorporates the allegations set forth in each of the Paragraphs above as if more fully set forth herein.

98.     At all times relevant hereto, TMG was Plaintiff Centner's employer. Additionally, at all times relevant hereto, Bauer was a representative of TMG whom Plaintiff Centner reasonably believed was in a managerial or supervisory position and that had the authority to investigate information provided to Defendant Bauer concerning violations of Arizona law and to take actions to prevent further state law violations.

99.     Defendants were informed of the facts underlying Plaintiffs' reasonable beliefs that TMG had violated numerous Arizona statutes, as well as the deceptive business statutes of several other states.

100.    After having been informed of the facts underlying Plaintiffs' reasonable beliefs that TMG had violated numerous Arizona statutes, as well as the deceptive business statutes of several other states, Defendants wrongfully terminated Plaintiff Centner's employment in retaliation for the disclosure of such information.   Such discharge was in violation of Arizona Revised Statute § 23-1501(3)(A)(c)(ii).

101.    As a direct and proximate result of Defendants' retaliatory discharge of Plaintiff Centner's employment in violation of Arizona Revised Statute §23-1501 *et seq*., Plaintiff Centner has sustained damages.

## COUNT II

### (On Behalf of Plaintiff Centner for Fraudulent Inducement Against All Defendants)

102.    Plaintiff Centner incorporates the allegations set forth in each of the Paragraphs above as if more fully set forth herein.

28

103.   Prior to January 16, 2021, Defendant Bauer and Plaintiff Centner discussed the prospect of Plaintiff Centner becoming an employee of TMG.

104.   During these discussions, which are expressly referenced in Plaintiff Centner's employment letter as having formed the basis of TMG's offer of employment to Plaintiff Centner, Defendant Bauer, on behalf of TMG, stated that Plaintiff Centner would also be paid compensation in addition to her salary.   Such representations concerning Plaintiff Centner's additional compensation, which are consistent and additional terms of Plaintiff's employment agreement, were expressly confirmed in a letter dated June 30, 2021, which is annexed hereto as Exhibit 1.

105.   Defendant Bauer made such representations to Plaintiff Centner regarding Plaintiff Centner's additional compensation in order to induce Plaintiff Centner to accept employment with TMG.

106.   At the time that Defendant Bauer made such representations to Plaintiff Centner concerning Plaintiff Centner's additional compensation, Defendant Bauer knew such representations were false – a fact that was unknown to Plaintiff Centner.

107.   Plaintiff Centner accepted Defendants' offer of employment as a result of Defendant Bauer's false representations concerning Plaintiff Centner's additional compensation.

108.   On or about March 24, 2022, TMG terminated Plaintiff Centner's employment without having paid Plaintiff Centner the promised additional compensation, thereby damaging Plaintiff Centner.

## COUNT III

**(On Behalf of Plaintiff Centner for Promissory Estoppel Against All Defendants)**

109.   Plaintiff Centner incorporates the allegations set forth in each of the Paragraphs above as if more fully set forth herein.

110.   Prior to January 16, 2021, Defendant Bauer and Plaintiff Centner discussed the prospect of Plaintiff Centner becoming an employee of TMG.

111.   During these discussions, which are expressly referenced in Plaintiff

Centner's employment letter as having formed the basis of TMG's offer of employment to Plaintiff Centner, Defendant Bauer, on behalf of TMG, stated that Plaintiff Centner would also be paid compensation in addition to her salary. Such representations concerning Plaintiff Centner's additional compensation, which are consistent and additional terms of Plaintiff's employment agreement, were expressly confirmed in a letter dated June 30, 2021, which is annexed hereto as Exhibit 1.

112.    Defendant Bauer's representations concerning Plaintiff Centner's additional compensation constituted a promise.

113.    Defendant Bauer should have reasonably foreseen that Plaintiff Centner would rely on Bauer's promise regarding Plaintiff Centner's additional compensation.

114.    In fact, Plaintiff Centner relied on Defendant Bauer's promise to Plaintiff Centner's detriment.

115.    On or about March 24, 2022, TMG terminated Plaintiff Centner's employment without having paid Plaintiff Centner the promised additional compensation, thereby damaging Plaintiff Centner.

## COUNT IV
### (On Behalf of Plaintiff Paradis for Violation of Arizona Revised Statute ARS § 23-1501(A)(3)(c)(ii) Wrongful Termination – Retaliatory Firing Against All Defendants)

116.    Plaintiff Paradis incorporates the allegations set forth in each of the Paragraphs above as if more fully set forth herein.

117.    At all times relevant hereto, TMG was Plaintiff Paradis' employer. Additionally, at all times relevant hereto, Bauer was a representative of TMG whom Plaintiff Paradis reasonably believed was in a managerial or supervisory position and that had the authority to investigate information provided to Defendant Bauer concerning violations of Arizona law and to take actions to prevent further state law violations.

118.    Defendants were informed of the facts underlying Plaintiffs' reasonable beliefs that TMG had violated numerous Arizona statutes, as well as the deceptive business statutes of several other states.

30

119.    After having been informed of the facts underlying Plaintiffs' reasonable beliefs that TMG had violated numerous Arizona statutes, as well as the deceptive business statutes of several other states, Defendants terminated Plaintiff Paradis' employment in retaliation for the disclosure of such information.  Such discharge was in violation of Arizona Revised Statute § 23-1501(3)(A)(c)(ii).

120.    As a direct and proximate result of Defendants' retaliatory discharge of Plaintiff Paradis' employment in violation of Arizona Revised Statute §23-1501 et seq., Plaintiff Paradis has sustained damages.

### COUNT V
### (On Behalf of Plaintiff Paradis for Fraudulent Inducement Against All Defendants)

121.    Plaintiff Paradis incorporates the allegations set forth in each of the Paragraphs above as if more fully set forth herein.

122.    Prior to January 2, 2021, Defendant Bauer and Plaintiff Paradis discussed the prospect of Plaintiff Paradis becoming an employee of TMG.

123.    During these discussions, which are expressly referenced in Plaintiff Paradis' employment letter as having formed the basis of TMG's offer of employment to Plaintiff Paradis, Defendant Bauer, on behalf of TMG, stated that, in addition to his annual base salary of $300,000, Plaintiff Paradis would also be paid additional compensation. Such representations concerning Plaintiff Paradis' additional compensation, which are consistent and additional terms of Plaintiff's employment agreement, were expressly confirmed in Exhibits 1- 3 annexed hereto.

124.    Defendant Bauer made such representations to Plaintiff Paradis regarding Plaintiff Paradis' additional compensation in order to induce Plaintiff Paradis to accept employment with TMG.

125.    At the time that Defendant Bauer made such representations to Plaintiff Paradis concerning Plaintiff Paradis' additional compensation, Defendant Bauer knew such representations were false – a fact that was unknown to Plaintiff Paradis.

126.    Plaintiff Paradis accepted Defendants' offer of employment as a result of Defendant Bauer's false representations concerning Plaintiff Paradis' additional compensation.

127.    On or about March 24, 2022, TMG terminated Plaintiff Paradis' employment without having paid Plaintiff Paradis' additional compensation, thereby damaging Plaintiff Paradis.

## **COUNT VI**

## **(On Behalf of Plaintiff Paradis for Promissory Estoppel Against All Defendants)**

128.    Plaintiff Paradis incorporates the allegations set forth in each of the Paragraphs above as if more fully set forth herein.

129.    Prior to January 2, 2021, Defendant Bauer and Plaintiff Paradis discussed the prospect of Plaintiff Paradis becoming an employee of TMG.

130.    During these discussions, which are expressly referenced in Plaintiff Paradis' employment letter as having formed the basis of TMG's offer of employment to Plaintiff Paradis, Defendant Bauer, on behalf of TMG, stated that, in addition to his annual base salary of $300,000, Plaintiff Paradis would also be paid additional compensation. Such representations concerning Plaintiff Paradis' additional compensation, which are consistent and additional terms of Plaintiff's employment agreement, were expressly confirmed in Exhibits 1- 3 annexed hereto.

131.    Defendant Bauer's representations concerning Plaintiff Paradis' additional compensation constituted promises.

132.    Defendant Bauer should have reasonably foreseen that Plaintiff Paradis would rely on Bauer's promises regarding Plaintiff Paradis' additional compensation.

133.    In fact, Plaintiff Paradis relied on Defendant Bauer's promises to Plaintiff Paradis' detriment.

134.    On or about March 24, 2022, TMG terminated Plaintiff Paradis' employment without having paid Plaintiff Paradis' additional compensation, thereby damaging Plaintiff Paradis.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court:

      a.     Order Defendants to pay Plaintiffs:

      (i)  past earnings;

      (ii) future earnings;

      (iii) loss benefits;

      (iv) actual damages;

      (v) compensatory damages;

      (vi) punitive damages;

      (vii) attorneys' fees; and

      (viii) such further relief as the Court deems just.

Dated:      April 25, 2022

      By:    _____

            Erik W. Centner, Esq. (#035107)

1

## **DEMAND FOR TRIAL BY JURY**

2        Plaintiffs demand a trial by jury on all issues so triable.

3

4 Dated:       April 25, 2022

5

6                         By: _____

7                           Erik W. Centner, Esq. (#035107)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT NO. 1



June 30, 2021
Ian Dyck, Vice President Corporate Development
Util-Assist Inc.
470 Harry Walker Parkway South
Newmarket, Ontario
L3Y 7B3, Canada
Idyck@util-assist.com

Dear Ian:

I write pursuant to Util-Assist Inc.'s ("UA") Letter of Intent dated May 28, 2021 (the "LOI"). In the LOI, under the Section entitled, *Conduct of Business*, TMG Utility Advisory Services, Inc. ("TMG") agreed that it would not "make or pay any dividends or bonuses," without: (i) providing UA with notice of TMG's intent to make such payments and (ii) first receiving UA's prior written consent to do so, which shall not be unreasonably delayed or withheld. *See* LOI at Section *Conduct of Business at (b)*.

Accordingly, pursuant to the LOI's Section *Conduct of Business (b)*, TMG writes to notify UA of TMG's intent to pay mid-year bonuses to TMG's Senior Leadership Employees, as set forth herein, and to obtain UA's consent for such action.

## Mid-Year Bonuses To Be Paid

By no later than July 9, 2021, TMG intends to pay its Senior Leadership Employees the following mid-year bonuses:

| Senior Leadership Employee | Title | Amount to Be Paid |
|---|---|---|
| Mario Bauer | Chief Executive Officer | $600,000.00 |
| Pam Glanvill | President | $200,000.00 |
| Paul O. Paradis | Chief Operations Officer | $400,000.00 |
| Gina Centner | Chief Compliance Officer | $300,000.00 |
| Anthony Filoso | Chief Financial Officer | $ 50,000.00 |

It is TMG's intention to pay its Senior Leadership Employees the mid-year bonuses reflected above in recognition of work performed by these individuals during the ordinary, normal course of business in the initial six months of 2021, and in recognition of the current success of the TMG's business, which has continued to flourish, despite the many hurdles presented by the Covid-19 pandemic. Significantly, these bonuses ***are not*** being paid in connection with any aspect of the potential transaction involving UA and TMG.

Finally, although the LOI makes clear that TMG is not required to obtain written consent from UA for any act that is "consistent with usual or normal course of business," and



the bonus payments set forth above clearly qualify as such, TMG is nevertheless providing this notice and seeks UA's approval for these bonus payments in furtherance of the very professional relationship that exists between the parties and out of courtesy to UA. **This letter and the information contained herein is designated "HIGHLY CONFIDENTIAL" and is only to be discussed by and among you, me and Paul Paradis.**

Sincerely,

Mario Bauer
President & Chief Executive Officer
TMG Utility Advisory Services, Inc.

# EXHIBIT NO. 2



# Re: Possible House Lease

1 message

**Ericia Caras** <ericia.caras@tmgconsulting.com>
To: Paul Paradis <pparadis7@gmail.com>
Cc: Mario Bauer <mario.bauer@tmgconsulting.com>

Wed, Jan 27, 2021 at 11:20 AM

Great, thanks!


Ericia Caras
810.348.8722
**Resource Manager**
**TMG Consulting | Twitter | LinkedIn**



**From:** Paul Paradis <pparadis7@gmail.com>
**Sent:** Wednesday, January 27, 2021 11:19 AM
**To:** Ericia Caras <ericia.caras@tmgconsulting.com>
**Cc:** Mario Bauer <mario.bauer@tmgconsulting.com>
**Subject:** Re: Possible House Lease

Hi Ericia,

Thanks for your quick response.

1. Yes, TMG will be signing the lease and Mario said he will sign on behalf of TMG.
2. Gina and I will review the lease and identify any issues - but she said they are going to use a standard residential house lease, so I do not anticipate any issues because those are general pretty standard forms.
3. Yes, TMG will be making the lease payments directly - please ask Mariam what she needs from Jana to get that set up.

Thank you.

On Wed, Jan 27, 2021 at 10:55 AM Ericia Caras <ericia.caras@tmgconsulting.com> wrote:
Thank you for the update, Paul. I will reach out to her. Just touching base on some of the logistics.

- Will TMG be signing the lease? If so, who has signing authority on behalf of the company?

# EXHIBIT NO. 3

Page 1 of 8

# RESIDENTIAL LEASE AGREEMENT

Document updated:
October 2019



**ARIZONA** association of **REALTORS®** REAL SOLUTIONS. REALTOR® SUCCESS.

The pre-printed portion of this form has been drafted by the Arizona Association of REALTORS®. Any change in the pre-printed language of this form must be made in a prominent manner. No representations are made as to the legal validity, adequacy and/or effects of any provision, including tax consequences thereof. If you desire legal, tax or other professional advice, please consult your attorney, tax advisor or professional consultant.

 

1. **LANDLORD:**  Patricia Marie Otondo _____ or ☐ identified on Line 330.
   PROPERTY OWNER(S) (LANDLORD) NAME(S)

2. **TENANT:**  TMG Consulting,Inc., _____ Mario Bauer, Mgr
   TENANT(S) NAME(S)

3. Landlord and Tenant enter into this Residential Lease Agreement ("Lease Agreement") on the terms contained herein. Landlord
4. rents to Tenant and Tenant rents from Landlord, the real property and all fixtures and improvements thereon and appurtenances
5. incident thereto, plus personal property described below (collectively the "Premises").

6. Premises Address: **7441 E CENTURY Drive** _____ Maricopa

7. City: _____ **Scottsdale** _____ AZ, Zip Code: _____ **85250**

8. **Personal Property Included and to be maintained in operational condition by Landlord:**
9. ☐ Washer   ☐ Dryer   ☑ Refrigerator   ☐ Range/Oven   ☐ Dishwasher   ☑ Microwave
10. ☐ Other: _____

11. **Occupancy:** The Premises shall be used only for residential purposes and only by the following named persons:
12. Paul Paradis
13.

14. **Assignment and Occupancy Restrictions:** Only persons listed above may occupy the Premises or any part thereof without Landlord's
15. prior written consent. If Tenant attempts to sublet, transfer, or assign this Lease Agreement and/or allows any persons other than those listed
16. above to occupy the Premises without Landlord's prior written consent, such act shall be deemed a material non-compliance by Tenant
17. of this Lease Agreement and Landlord may terminate this Lease Agreement.

18. **Addenda Incorporated:** ☑ Lead-based Paint Disclosure   ☑ Move-In/Move-Out Condition Checklist
19. ☐ Other: _____

20. **Term:** The Lease Agreement shall begin   on **2/24/2021** at **noon** and end on **2/23/2023** at **noon**,
                                                    MO/DA/YR      TIME                    MO/DA/YR      TIME
21. at which time this Lease Agreement shall automatically continue on a month-to-month basis, with all other terms and conditions set forth
22. herein remaining the same, unless either party provides written notice to the other of their intention to terminate the Lease Agreement.
23. Notice to terminate the Lease Agreement at the end of the original term shall be given on or prior to the last rental due date of the original
24. term. Notice to terminate, if on a month-to-month basis, shall be given thirty (30) days prior to the periodic rental due date. At lease
25. termination Tenant shall return all keys/garage door/entry gate openers as described herein and vacate the Premises.

26. **IF TENANT WILLFULLY FAILS TO VACATE THE PREMISES AS PROVIDED FOR IN THIS LEASE AGREEMENT, LANDLORD**
27. **SHALL BE ENTITLED TO RECOVER AN AMOUNT EQUAL TO BUT NOT MORE THAN TWO (2) MONTHS' PERIODIC RENT**
28. **OR TWICE THE ACTUAL DAMAGES SUSTAINED BY LANDLORD, WHICHEVER IS GREATER, AS PROVIDED FOR IN THE**
29. **ARIZONA RESIDENTIAL LANDLORD AND TENANT ACT ("ARLTA").**

30. **Earnest Money:**        ☐ No Earnest Money is required.
31.                          ☒ Earnest Money is required in the amount of $ _____ **2,500.00** _____.
32.                          Until offer is accepted, Landlord is entitled to lease the Premises to another tenant.

33. **Form of Earnest Money:**   ☐ Personal Check   ☑ Cashier's Check   ☑ Other: _____ **Wire or direct Deposit**

34. Upon acceptance of this offer by Landlord, Earnest Money will be deposited with:
35.                          ☐ Broker's Trust Account _____
                             (PRINT BROKERAGE FIRM'S NAME)
36.                          ☒ Landlord
37.                          ☐ Other: _____

>>

Residential Lease Agreement  •  Updated: October 2019
Copyright © 2019 Arizona Association of REALTORS®. All rights reserved.

<Initials    Initials>

LANDLORD | LANDLORD                                    TENANT | TENANT

Page 1 of 8



Suzanne Gammage | Russ Lyon Sotheby's Internatio | 480-612-2444  |

InstanetFORMS

*Residential Lease Agreement >>*

Page 2 of 8

38. All Earnest Money shall consist of immediately available funds and is subject to collection. In the event any payment for Earnest Money is
39. dishonored for any reason, at Landlord's option, Landlord shall be immediately released from all obligations under this Lease Agreement by
40. notice to Tenant. Upon acceptance of this Lease Agreement by all parties, all Earnest Money shall be applied to deposits and/or initial rents.

41. **Periodic Rental Due Date:** The Rent and all other accrued charges shall be due and payable no later than 5:00 p.m. on the_____ day
42. of each month (regardless of weekends or holidays). Rent shall be payable in advance without deductions or offsets. Landlord is not required
43. to accept a partial payment of Rent or other charges. If the sales tax changes during the term of this Lease Agreement, Landlord may adjust
44. the amount of Rent due to equal the difference caused by the tax change upon thirty (30) days notice to Tenant.

45. **Rent:** Tenant shall pay monthly installments of $_____ 5380 _____plus any applicable sales taxes, which are currently
46. $ 123.74 , totaling $ 5503.74 ("Rent") to: **Patricia Marie Otondo**
47. at: **Chase Acct# Routing:1221000 Account# 687178723 (for domestic wiring, routing # is 021 000 021)**.

48. **Late Charges and Returned Checks:** A late charge of $_____ 100 per day _____shall be added to all Rent  not received
49. by ☒5:00 p.m. on the due date or ☐ _____days after due date and shall be collectible as Rent. Tenant shall pay a charge  of
50. $_____ for all funds dishonored for any reason, in addition to the late charge provided herein.
51. These additional charges shall be collectible as Rent. If a Rent payment has been returned unpaid for any reason,
52. Landlord shall be entitled to demand that all sums due pursuant to this Lease Agreement be paid in the form of a cashier's
53. check or money order.

54. **Late or Partial Payments:** The acceptance by Landlord of any late or partial payment shall not change the due date or amount of
55. any required payment in the future and shall not relieve Tenant of any obligation to pay the balance of the Rent and any  applicable
56. late fees or costs.

57. **Rent Proration:** If Rent is being prorated for a period other than a full month, Tenant shall pay on 02/23/2021 $ 896.67 plus any
                                                                                                            MO/DA/YR
58. applicable sales tax of $ 20.62 , totaling $ 917.29 for the prorated period beginning 02/24/2021 and ending 02/28/2021.
                                                                                         MO/DA/YR                  MO/DA/YR

59. **Note: The ARLTA prohibits a landlord from demanding or receiving security, however denominated, including,**
60. **but not limited to, prepaid Rent in an amount or value in excess of one and one-half month's Rent; however the**
61. **ARLTA does not prohibit a tenant from voluntarily paying more than one and one-half month's Rent in advance.**
62. **The breakdown of the deposit amounts shown below is solely for the purpose of showing how such amounts**
63. **were calculated and does not limit landlord's right to use all deposit amounts as permitted by the ARLTA.**
64. **Deposits may be placed in interest-bearing accounts, which interest shall be retained by the Broker or Landlord.**
65. **REFUNDABLE DEPOSITS SHALL NOT BE USED AS A CREDIT TOWARDS LAST MONTH'S RENT.**

66. **Initial Rent Payment:** $ 6421.03

67. **Refundable Security Deposit Due:** "Security Deposit" is given to assure payment or performance under this Lease Agreement.
68. "Security Deposit" does not include a reasonable charge for redecorating or cleaning.

69.  Security deposit:      $ 7500

70.   Pet deposit: + $ 500 (assistive and service animals are not considered "pets")

71.   Cleaning deposit: + $

72. **Non-refundable Charges Due:**

73.   Cleaning Fee: + $ 500 (for additional cleaning and sanitizing of the Premises after Tenant vacates)

74. Redecorating Fee: + $_____(for periodic repair/replacement of floor and window coverings, paint and
75.                                         decorative items after Tenant vacates)

76.   Pet Cleaning Fee: + $_____(for additional wear, tear and cleaning after Tenant vacates)
77.                                         (assistive and service animals are not considered "pets")

78.     Other Fee: + $_____(for **Initial Rent includes February & March Rent + Tax** )

79. **Tax Due on Initial Rent and Non-refundable Charges Paid to Landlord:**
80. Sales tax charged: + $ 155.86 City rental tax rate   2.3 % Taxable amount $ 6,776.67

81. **Total Required Payment:**      $ 15076.89
82. Less Earnest Money              - $ 2500
83. **BALANCE DUE (CERTIFIED FUNDS):** $ 12576.89 to be delivered to Landlord on or before 02/22/2021
                                                                                          MO/DA/YR

84. **Refundable deposits will be held:** ☒ by Landlord ☐ in Broker's Trust Account _____
                                                                       BROKERAGE FIRM NAME                              >>

Residential Lease Agreement • Updated: October 2019
Copyright © 2019 Arizona Association of REALTORS®. All rights reserved.

LANDLORD | LANDLORD  <Initials        Initials>  TENANT | TENANT

Page 2 of 8

**Suzanne Gammage | Russ Lyon Sotheby's Internatio | 480-612-2444 |**



**Residential Lease** Agreement >>

85. No refundable deposit shall be transferred from the Broker's Trust Account to anyone other than Tenant without ten (10) calendar days'
86. written notice to Tenant. If deposits are held by Landlord, Tenant and Landlord agree to hold Broker harmless of all liability regarding said
87. deposits. If the Premises are surrendered to Landlord at the termination or expiration of this Lease Agreement in a clean and undamaged
88. condition acceptable to Landlord, Landlord shall return the refundable deposits to Tenant within the time period provided for in the ARLTA.
89. However, if the Premises are delivered to Landlord in an unclean, damaged or unacceptable condition, Landlord shall be entitled  to
90. retain all or a portion of the refundable deposits and hold Tenant liable for any additional charges.

91. **Application/Credit/Background Contingency:** A credit/background report(s) application fee of $_____
92. is due by separate payment and is non-refundable. This Lease Agreement is contingent on satisfactory verification    and
93. approval by Landlord of Tenant's employment, credit, banking references, income, past rental history, and criminal  and/or
94. other background check(s) prior to possession. Tenant consents to these credit/background check(s) by Landlord or Broker.
95. Tenant shall complete a separate rental and/or credit application containing all the required information. Tenant   warrants
96. that the information is correct and complete and that Tenant has disclosed all pertinent information and has not withheld any
97. information, including, but not limited to, poor credit, early terminations of leases, evictions or bankruptcy. Tenant's material
98. falsification of any information provided to Landlord shall entitle Landlord to terminate this Lease Agreement and pursue all
99. applicable remedies, damages, court costs and reasonable attorneys' fees. The credit history of Tenant with respect to this
100. Lease Agreement may be reported to any credit bureau or reporting agency.

101. **Pets** (including, but not limited to animals, fish, reptiles or birds): Assistive and service animals are not considered "pets."
102. ☐ No pets allowed. Tenant agrees not to keep or permit any pets on the Premises without prior written consent of the  Landlord.
103. ☒ Landlord hereby grants Tenant permission to keep the following described pet(s) on the Premises:
104. _____ and Tenant
105. ☒ is required    ☐ is not required to maintain a liability insurance policy to cover any liability incurred due to pet(s) with a
106. minimum of $ __minimum__ coverage and cause Landlord to become an "additional insured" under the policy.

107. **Keys:** Landlord agrees to deliver to Tenant keys for Premises:   ☑ _2_ Door    ☐ _____ Pool    ☐ _____ Mail Box
108. ☐ _____ Entry Gate  ☑ Other: **Key to back gate to pool** and ☐ _____ garage door openers upon possession.
109. Tenant shall pay Rent and shall remain responsible for the security of the Premises until all keys and garage door openers
110. have been physically returned to Landlord/Property Manager/Authorized Representative or otherwise satisfactorily accounted
111. for by Tenant. Leaving keys/garage door opener/entry gate opener in or on the Premises will not be considered returned
112. unless expressly authorized by Landlord in writing. Tenant agrees to pay all costs related to replacing lost or unreturned keys
113. and/or garage door/entry gate openers. Tenant shall not change the locks or add a deadbolt lock without Landlord's written
114. consent. Tenant acknowledges that unless otherwise provided herein, Premises have not been re-keyed.

115. **Utilities:** Tenant agrees to arrange, and pay for when due, all utilities except: **Tenant to pay all utilities including**
116. **Water (Eppicor), Electricity (APS), Gas (SW Gas) and trash pick up (City of Scottsdale-included in rent).**

117. **Association:** Premises is located within a community association(s):  ☐ Yes  ☑ No  If Yes, explain: _____
118. _____

119. **Association Dues:** If applicable, homeowners' and other association dues and assessments shall be paid by Landlord.

120. **Maintenance Responsibility:** The following shall be the responsibility of the party indicated:
121. A. Pool Maintenance:
122.    Cleaning/Routine Maintenance:  ☑ Landlord  ☐ Tenant  ☐ Association  ☐ Not applicable
123.              Pool Chemicals:  ☑ Landlord  ☐ Tenant  ☐ Association  ☐ Not applicable

124. B. Routine Pest Control:        ☐ Landlord  ☑ Tenant  ☐ Association  ☐ Not applicable

125. C. Yard Maintenance:
126.           Front Yard:  ☑ Landlord  ☐ Tenant  ☐ Association  ☐ Not applicable
127.           Back Yard:  ☑ Landlord  ☐ Tenant  ☐ Association  ☐ Not applicable

128. D. Other:_____     ☐ Landlord  ☐ Tenant  ☐ Association  ☐ Not applicable

129. **Upkeep of the Premises:** Tenant has completed all desired physical, environmental or other inspections and investigations of the
130. Premises and is satisfied with the physical condition, except as otherwise noted in writing. Tenant shall maintain the Premises in a
131. neat and undamaged condition and, in particular, shall comply with applicable provisions of building codes, homeowners' association
132. or other rules and regulations; maintain the Premises in a clean and safe condition; dispose of all ashes, rubbish, garbage and  other
133. waste; keep and use all plumbing and electrical, sanitary, heating, ventilating and air conditioning facilities and appliances in a clean
134. facilities and appliances in a clean and reasonable manner; and generally conduct themselves and others in their charge,  including
135. pets, in a manner so as not to disturb their neighbors or in any way, deface, damage, impair or otherwise destroy any part of the
136. Premises. Tenant shall immediately notify Landlord of any situation or occurrence that requires the Landlord to provide maintenance,

>>

Suzanne Gammage | Russ Lyon Sotheby's Internatio | 480-612-2444  |

InstanetFORMS

**Residential Lease Agreement >>**

137. make repairs, or otherwise requires Landlord to take action as required by the ARLTA, including, but not limited to any moisture
138. conditions from any source, leaks, evidence of mold/mildew, or of any inoperative mechanical, plumbing or electrical system or
139. component thereof. In the event Tenant notifies Landlord in writing of any condition requiring Landlord to make repairs or perform
140. maintenance, such notice shall constitute permission from Tenant for Landlord to enter the Premises for the sole purpose of
141. making the repairs or performing the maintenance requested. If Tenant fails to comply with such requirements, Landlord may
142. make necessary repairs and submit a bill to Tenant subject to the provisions of the ARLTA. Tenant also agrees to replace furnace
143. filters, air conditioning filters, light bulbs, water filters and smoke alarm and/or carbon monoxide detector batteries as frequently
144. as conditions require, or as otherwise provided. Landlord agrees to maintain the Premises as provided in the ARLTA and shall
145. comply with the requirements of applicable building codes, homeowners' association or other rules and regulations, make all repairs
146. necessary to keep the Premises in a fit and habitable condition.

147. **Rules and Law:** Tenant has either received a copy of any rules, regulations, covenants, conditions and restrictions, homeowners'
148. association rules, ordinances, and laws ("Rules and Law") concerning the Premises, or has made an independent investigation
149. of the applicability of any such Rules and Law to Tenant's use of the Premises. If the homeowners' association, state, county,
150. municipal or other governmental bodies adopt new ordinances, rules or other legal provisions affecting this lease Agreement,
151. Landlord may make immediate amendments to bring this Lease Agreement into compliance with the law. In such event, Landlord
152. agrees to give Tenant notice that this Lease Agreement has been amended and shall provide a brief description of the amendment
153. and the effective date.

154. **Compliance with Rules and Law:** Landlord and Tenant agree to comply with the applicable Rules and Law concerning the
155. Premises. Tenant agrees to supervise other occupants, family, guests, invitees, or other persons under Tenant's control to ensure
156. their compliance with the Rules and Law and shall be responsible for any actions of the foregoing who violate this Lease Agreement
157. or the applicable Rules and Law. Tenant shall immediately notify Landlord upon receipt of any notice of violation and shall pay any
158. fines or penalties assessed by any governing body as a result of Tenant's noncompliance with Rules and Law.

159. **(TENANT'S INITIALS REQUIRED)** _____ _____
TENANT          TENANT

160. **Crime-Free Provision:** Tenant, occupants, family, guests, invitees, or other persons under Tenant's control shall not engage in or
161. facilitate: (i) any acts involving imminent or actual serious property damage as defined by law; (ii) any criminal activity (state, federal or
162. other municipality), including drug-related criminal activity, any act of violence or threats of violence, other illegal activity, including
163. prostitution, criminal street gang activity, threatening or intimidating, unlawful discharge of firearms, or assault; (iii) jeopardize the health,
164. safety and welfare of Tenants, Landlord, Landlord's representatives, agents or others.
165. **VIOLATION OF THIS PROVISION SHALL CONSTITUTE A MATERIAL AND IRREPARABLE VIOLATION OF THIS LEASE**
166. **AGREEMENT AND CAUSE FOR IMMEDIATE TERMINATION OF THE TENANCY.**

167. **Swimming Pool Barrier Regulations:** Tenant agrees to investigate all applicable state, county, and municipal Swimming
168. Pool Barrier Regulations and agrees to comply with said regulations while occupying the Premises, unless otherwise agreed in
169. writing. If the Premises contains a swimming pool, Tenant acknowledges receipt of the Arizona Department of Health Services
170. approved private pool safety notice. Landlord and Tenant expressly relieve and indemnify brokers from any and all liability and
171. responsibility for compliance with any applicable pool barrier laws and regulations.

172. **(TENANT'S INITIALS REQUIRED)** _____ _____
TENANT          TENANT

173. **Lead-based Paint Disclosure:** If the Premises were built prior to 1978, the Landlord shall: (i) notify the Tenant of any known
174. lead-based paint ("LBP") or LBP hazards in the Premises; (ii) provide the Tenant with any LBP risk assessments or inspections of
175. the Premises in the Landlord's possession; (iii) provide the Tenant with the Disclosure of Information on Lead-based Paint and
176. Lead-based Paint Hazards, and any report, records, pamphlets, and/or other materials referenced therein, including the
177. pamphlet "Protect Your Family from Lead in Your Home" (collectively "LBP Information").

178. [X] The Premises were constructed prior to 1978 and Tenant has received and executed the Disclosure of Information on
179. Lead-based Paint and Lead-based Paint Hazards, and has received any reports, records, pamphlets, and/or other materials
180. referenced therein, including the pamphlet "Protect Your Family from Lead in Your Home."

181. **(TENANT'S INITIALS REQUIRED)** _____ _____
TENANT          TENANT

182. **OR**

183. [ ] Premises were constructed in 1978 or later.

184. **(TENANT'S INITIALS REQUIRED)** _____ _____
TENANT          TENANT

185. **Smoke Detectors:** The Premises [X] does  [ ] does not contain smoke detector(s). If yes, Tenant shall maintain the
186. detector(s) in working condition, change batteries and notify Landlord if the detector is not working properly or missing from
187. the Premises.

188. **Carbon Monoxide Detectors:** The Premises [ ] does  [X] does not contain carbon monoxide detector(s). If yes, Tenant shall
189. maintain the detector(s) in working condition, change batteries and notify Landlord if the detector is not working properly or
190. missing from the Premises.

| | | <Initials | Residential Lease Agreement • Updated: October 2019 | Initials> | | |
|---|---|---|---|---|---|---|
| LANDLORD | LANDLORD | | Copyright © 2019 Arizona Association of REALTORS®. All rights reserved. | | TENANT | TENANT |



Suzanne Gammage | Russ Lyon Sotheby's Internatio | 480-612-2444 |

InstanetFORMS

**Residential Lease Agreement >>**

191. **Fire Sprinklers:** The Premises ☐ **does** ☒ **does not** contain fire sprinklers. If yes, Tenant shall notify Landlord if the
192. sprinklers are not working properly or are missing from the Premises.

193. **Alterations and Improvements:** Tenant shall not make any alterations, changes or improvements to the Premises without
194. Landlord's prior written consent. Tenant may be held responsible for any damages resulting from unauthorized alterations,
195. changes or improvements as well as the cost to restore the Premises to its move-in condition.

196. **Tenant Liability/Renter's Insurance:** Tenant assumes all liability for personal injury, property damage or loss, and insurable
197. risks except for that caused by Landlord's negligence. Landlord strongly recommends that Tenant obtain and keep renter's
198. insurance in full force and effect during the full term of this Lease Agreement.

199. **Access:** Tenant shall not unreasonably withhold consent to Landlord or Landlord's representative(s) to enter into the Premises to inspect;
200. make necessary or agreed repairs, decorations, alterations or improvements; supply necessary or agreed services; or exhibit the Premises
201. to prospective or actual purchasers, mortgagees, tenants, workmen or contractors. Landlord may enter the Premises without consent of
202. Tenant in case of emergency. Landlord shall not abuse the right to access or use it to harass Tenant. Except in case of emergency,
203. Tenant's written request for repairs, or if it is impracticable to do so, Landlord shall give Tenant at least two days' notice in writing of the
204. intent to enter and enter only at reasonable times.

205. **Tenant Obligations upon Vacating Premises:** Upon termination of this Lease Agreement, Tenant shall surrender the Premises
206. to Landlord in the same condition as when the Agreement term commenced, reasonable wear and tear excepted; all debris will
207. be removed from the Premises; mail forwarded; and keys/garage door opener/entry gate opener returned to Landlord/Property
208. Manager/Authorized Representative. Tenant shall have all utilities on until completion of the move-out inspection. Tenant may be
209. present at the move-out inspection and, upon request, the Tenant shall be notified when the move-out inspection will occur.

210. **Trustee's Sale Notice:** Per A.R.S. § 33-1331 Landlord shall notify Tenant in writing within five (5) days of receipt of a notice of trustee's
211. sale or other notice of foreclosure on the Premises. Tenant shall notify Landlord immediately upon receipt of any notice of trustee's sale
212. or other notice on the Premises. Landlord shall not allow the Premises to be foreclosed.

213. **Death of Tenant:** Tenant may provide and update Landlord with the name and contact information of a person who is authorized to
214. enter the Premises to retrieve and store Tenant's personal property if Tenant dies during the term of this Lease Agreement. In the event
215. of Tenant's death during the term of this Lease Agreement, Landlord may release Tenant's personal property pursuant to the ARLTA.

216. **Breach:** In the event of a breach of this Lease Agreement, the non-breaching party may proceed against the breaching party in
217. any claim or remedy that the non-breaching party may have in law or equity.

218. **Attorney Fees and Costs:** The prevailing party in any dispute or claim between Tenant and Landlord arising out of or relating to this
219. Lease Agreement shall be awarded all their reasonable attorney fees and costs, along with all costs and fees incurred as a result of any
220. collection activity. Costs shall include, without limitation, expert witness fees, fees paid to investigators, and arbitration costs.

221. **Servicemembers' Civil Relief Act:** If Tenant enters into military service or is a military service member and receives military orders
222. for a change of permanent station or to deploy with a military unit or as an individual in support of a military operation for a period of
223. ninety (90) days or more, Tenant may terminate this Lease Agreement by delivering written notice and a copy of Tenant's official
224. military orders to Landlord. In such a case, this Lease Agreement shall terminate thirty (30) days after the next monthly rental payment
225. is due. Military permission for base housing does not constitute a change of permanent station order.

226. **Copies and Counterparts:** A fully executed facsimile or electronic copy of the Lease Agreement shall be treated as an original.
227. This Lease Agreement and any other documents required by this Lease Agreement may be executed by facsimile or other electronic
228. means and in any number of counterparts, which shall become effective upon delivery as provided for herein, except that the Lead-
229. based Paint Disclosure Statement may not be signed in counterpart. All counterparts shall be deemed to constitute one instrument,
230. and each counterpart shall be deemed an original.

231. **Entire Agreement:** This Lease Agreement, and any addenda and attachments, shall constitute the entire agreement between Landlord
232. and Tenant, shall supersede any other written or oral agreements between Landlord and Tenant and can be modified only by a writing
233. signed by Landlord and Tenant. The failure to initial any page of this Lease Agreement shall not affect the validity or terms of this Lease
234. Agreement.

235. **Time of Essence:** Time is of the essence in the performance of the obligations described herein.

236. **Arizona Law:** This Agreement shall be governed by Arizona law and jurisdiction is exclusively conferred on the State of Arizona.

237. **Waivers:** No waiver by Landlord of any provision herein shall be enforceable against Landlord unless in writing signed by Landlord, nor
238. shall it be deemed a waiver of any other provision herein or of any subsequent breach by Tenant of the same or any other provision.
239. Landlord's consent to or approval of any act shall not constitute a continuing consent to or approval of any subsequent act by Tenant.

240. **Subordination:** This Lease Agreement shall be subordinate to all present and future ground leases, mortgages, deeds of trust and
241. any other encumbrances consented to by Landlord and also to any modifications or extensions thereof. Tenant agrees to execute any
242. subordination agreements or other similar documents presented by Landlord within three (3) days of delivery.

243. **Permission:** Landlord and Tenant grant Brokers permission to advise the public of this Lease Agreement and the price and terms herein.

>>

| | | ‹Initials› | Residential Lease Agreement • Updated: October 2019 | Initials› | | |
| LANDLORD | LANDLORD | | Copyright © 2019 Arizona Association of REALTORS®. All rights reserved. | | TENANT | TENANT |



Suzanne Gammage | Russ Lyon Sotheby's Internatio | 480-612-2444 |

**Instanet**FORMS

*Residential Lease Agreement >>*

244. **Equal Housing Opportunity:** Landlord and Brokers comply with federal, state, and local fair housing laws and regulations.

245. **Construction of Language:** The language of this Lease Agreement shall be construed according to its fair meaning and not
246. strictly for or against either party. All singular and plural words shall be interpreted to refer to the number consistent with circumstances
247. and context.

248. **Court Modification:** If any provision of this Lease Agreement is found by a court to be invalid, illegal or vague, the parties agree
249. that such provision shall be modified or stricken by the court to the minimum extent deemed necessary to make it valid, legal and
250. enforceable and that all other provisions of this Lease Agreement shall remain in full force and effect.

251. **Days:** All references to days in this Lease Agreement shall be construed as calendar days and a day shall begin at 12:00 a.m.
252. and end at 11:59 p.m.

253. **Notices:** Unless otherwise provided for by statute or by agreement of the parties, all notices herein shall be in writing and
254. shall be delivered to Landlord at the address set forth herein and to Tenant at the Premises and shall be sent by registered or
255. certified mail, or personally delivered. Such notice shall be deemed received on the date the notice is actually received or
256. five (5) days after the date the notice is mailed by registered or certified mail, whichever occurs first.

257. **Additional Terms:**

258. Second year lease amount to increase by 3% ($5380 x 3% = $5541.40 plus city tax).

259. Home to be professional cleaned and sanitized prior to Move-In date.
260.

261. Rent amount includes full gardening services except where indicated, full weekly pool
262. service and garbage pick up with the City of Scottsdale.

263.
264.
265.
266.
267.
268.
269.
270.
271.
272.
273.

274. **Tenant Acknowledgment:** By signing below, Tenant acknowledges that: (i) A free copy of the Arizona Residential   Landlord
275. and Tenant Act is available through the Arizona Department of Housing; (ii) Landlord shall furnish upon move-in, a move-
276. in form for specifying any existing damages to the Premises and Tenant shall return the completed move-in form to Landlord
277. within five (5) days or_____days of occupancy or Tenant accepts the Premises in its existing condition;    (iii)
278. Tenant is hereby notified that Tenant is entitled to be present at the move-out inspection; (iv) Tenant understands       and
279. agrees to the terms and conditions of this Lease Agreement, and acknowledges a receipt of a copy of all (eight) 8 pages of
280. the Lease Agreement and any addenda.

281. **INDEMNITY AND RELEASE: THE PARTIES TO THIS LEASE AGREEMENT AGREE TO INDEMNIFY AND HOLD HARMLESS**
282. **BROKERS, PROPERTY MANAGERS, AND ANY OF THEIR RESPECTIVE AGENTS, REPRESENTATIVES OR EMPLOYEES**
283. **FROM ANY LOSS, CLAIM, LIABILITY OR EXPENSE ARISING FROM INJURY TO ANY PERSON OR DAMAGE TO OR**
284. **LOSS OF ANY PROPERTY, IN ANY WAY CAUSED BY THE PARTIES AND TENANT'S FAMILY, GUESTS,   INVITEES,**
285. **AGENTS, PETS OR OTHERS UNDER THEIR CONTROL.**

286.                                       **(LANDLORD'S INITIALS REQUIRED)** _____

|  | LANDLORD |
|---|---|
| LANDLORD |  |

287.                                       **(TENANT'S INITIALS REQUIRED)** _____

|  | TENANT |
|---|---|
| TENANT |  |

288. **Terms of Acceptance:** This offer will become a binding lease agreement when acceptance is signed by Landlord and a signed
289. copy delivered in person, by mail, facsimile or electronically, and received by Broker on behalf of Tenant if applicable, or

290. by Tenant no later than____ **February**____ **9**__, **2021**   at____ **6**____ ☐ a.m. ☑ p.m., Mountain Standard Time. Tenant may
291. withdraw this offer at any time prior to receipt of Landlord's signed acceptance. If no signed acceptance is received by this date  and
292. time, this offer shall be deemed withdrawn.

>>

Suzanne Gammage | Russ Lyon Sotheby's Internatio | 480-612-2444   |

InstanetFORMS

*Residential Lease Agreement >>*  Page 7 of 8

293. THIS LEASE AGREEMENT CONTAINS (EIGHT) 8 PAGES EXCLUSIVE OF ANY ADDENDA AND ATTACHMENTS. PLEASE
294. ENSURE THAT YOU HAVE RECEIVED AND READ ALL (EIGHT) 8 PAGES AS WELL AS ANY ADDENDA AND ATTACHMENTS.
**Broker on behalf of Tenant:**

296. Suzanne Gammage        SG084     Russ Lyon Sotheby's International Realty    145592578
PRINT SALESPERSON'S NAME              AGENT CODE      PRINT FIRM NAME                           FIRM CODE

297. _____
PRINT SALESPERSON'S NAME              AGENT CODE      PRINT FIRM NAME                           FIRM CODE

298. 6900 E Camelback Rd Suite #110              Scottsdale        AZ        85251
FIRM ADDRESS                          CITY                              STATE     ZIP CODE

299. 480-612-2444              480-624-3700        suzanne.gammage@russlyon.com
TELEPHONE          FAX                              EMAIL

300. **Agency Confirmation:** The Broker is the agent of (check one):
301. ☐ Tenant exclusively; or  ☒ both Tenant and Landlord

302. The undersigned agree to lease the Premises on the terms and conditions herein stated and acknowledge receipt of a copy
303. hereof including Tenant Attachment.

304. _____  02/09/2021  _____  02/09/202
^ TENANT'S SIGNATURE TMC Consulting, Inc., MO/DA/YR  ^ TENANT'S SIGNATURE Mario Bauer, Mgr  MO/DA/YR

305. _____
ADDRESS

306. _____
CITY                                                STATE     ZIP CODE

## LANDLORD ACCEPTANCE

307. **Broker on behalf of Landlord:**

308.     Suzanne Gammage         SG084     Russ Lyon Sotheby's International Realty    145592578
PRINT SALESPERSON'S NAME              AGENT CODE      PRINT FIRM NAME                           FIRM CODE

309. _____
PRINT SALESPERSON'S NAME              AGENT CODE      PRINT FIRM NAME                           FIRM CODE

310. 6900 E Camelback Rd Suite #110              Scottsdale        AZ        85251
FIRM ADDRESS                          CITY                              STATE     ZIP CODE

311. 480-612-2444              480-624-3700        suzanne.gammage@russlyon.com
TELEPHONE          FAX                              EMAIL

312. **Broker** is not authorized to receive notices or act on behalf of Landlord unless indicated below.

313. **Agency Confirmation:** The Broker is the agent of (check one):
314. ☐ Landlord exclusively; or  ☒ both Landlord and Tenant

315. **Property Manager,** if any, authorized to manage the Premises and act on behalf of Landlord pursuant to separate
316. written agreement:

317. n/a _____        _____
NAME                                                TELEPHONE

318. _____        _____
FIRM                                                TELEPHONE

319. _____
ADDRESS                          CITY                  STATE     ZIP CODE

>>

| LANDLORD | LANDLORD | <Initials | Residential Lease Agreement • Updated: October 2019<br>Copyright © 2019 Arizona Association of REALTORS®. All rights reserved. | Initials> | TENANT | TENANT |

Page 7 of 8


InstanetFORMS

*Residential Lease Agreement >>*

Page 8 of 8

320. Person authorized to receive service of process, notices, and demands is:

321. _____Patricia Marie Otondo_____
NAME / LANDLORD'S NAME

322. c/o _____   602-908-7776
PROPERTY MANAGER / AUTHORIZED REPRESENTATIVE      TELEPHONE

323. _____8483 E MALCOMB DR_____Scottsdale_____AZ_____85250
ADDRESS                          CITY                STATE    ZIP CODE

324. **Landlord Acknowledgment:** Landlord has read this entire Agreement. Landlord acknowledges that Landlord understands the
325. terms and conditions contained herein. Landlord accepts and agrees to be bound by the terms of this Lease Agreement.
326. Landlord has received a signed copy of this Lease Agreement and directs the Broker to deliver a signed copy to Tenant, and to any other
327. Broker involved in this Lease Agreement.

328. **LANDLORD ACKNOWLEDGES THAT LANDLORD HAS PROVIDED THE REQUIRED INFORMATION ON   RESIDENTIAL**
329. **RENTAL PROPERTY TO THE APPLICABLE COUNTY ASSESSOR.**

330. ☐   Counter Offer is attached, which is incorporated herein by reference. If there is a conflict between this Lease Agreement
331. and the Counter Offer, the provisions of the Counter Offer shall be controlling. (Note: If this box is checked, Landlord
332. should sign both Lease Agreement and Counter Offer.)

333. _____
^ SIGNATURE OF LANDLORD OR PROPERTY MANAGER (IF AUTHORIZED)                   MO/DA/YR

334. Patricia Marie Otondo
PRINT LANDLORD NAME

335. _____
^ SIGNATURE OF LANDLORD OR PROPERTY MANAGER (IF AUTHORIZED)                   MO/DA/YR

336. _____
PRINT LANDLORD NAME

337. _____
PRINT PROPERTY MANAGER NAME

338. _____8483 E MALCOMB DR_____  _____
ADDRESS                                    ADDRESS

339. __Scottsdale_____AZ_____85250_____  _____
CITY              STATE    ZIP CODE          CITY          STATE    ZIP CODE

340. ☐ **OFFER REJECTED BY LANDLORD OR PROPERTY MANAGER (IF AUTHORIZED):**

_____  _____ , _____   _____
MONTH            DAY    YEAR     (LANDLORD'S INITIALS)

**For Broker Use Only:**
Brokerage File/Log No._____ Manager's Initials_____ Broker's Initials_____ Date _____
                                                                                          MO/DA/YR

>>

| | | <Initials | Residential Lease Agreement • Updated: October 2019 Copyright © 2019 Arizona Association of REALTORS®. All rights reserved. | Initials> | | |
| LANDLORD | LANDLORD | | Page 8 of 8 | | TENANT | TENANT |

Suzanne Gammage | Russ Lyon Sotheby's Internatio | 480-612-2444 |



InstanetFORMS

# EXHIBIT NO. 4



# EXHIBIT NO. 5

**1:14**                                     ●●Ⅱ LTE 🔋



**Mario Bauer Cell** ›

Sun, Mar 13, 8:46 AM

Paul – Galluzzi has been hacked bad!  They have access to everything down to his Netflix accounts. Can I have Rocco work with Greg?  Greg needs help. I think we got the hacker out of TMG but he's into Greg's personal stuff

| GREGORY,GALLUZI | G › |
|---|---|

| TMG C INC | TC › |
|---|---|

Use this number for Greg

Sun, Mar 13, 11:35 AM

Just called you but no answer

Sun, Mar 13, 5:10 PM

At dinner. Call you in 20



iMessage

# EXHIBIT NO. 6

## PROFESSIONAL SERVICES CONTRACT

**BETWEEN:**

### TMG CONSULTING
(the "Contractor")

and

### EPCOR UTLITIES INC.
("EPCOR")

**WHEREAS:**

The Contractor agrees to provide the Services (as defined and described in attached Schedule "A") to EPCOR in accordance with the terms and conditions in attached Schedule "B". EPCOR will pay to the Contractor, as full and complete compensation for the performance of the Services in accordance with this Contract, the amounts stated in Schedule "A" in the manner and at the time stated in Schedule "A".

**NOW THEREFORE,** in consideration of the mutual covenants and conditions contained in this Contract, the parties mutually covenant and agree as follows:

1. The total value of this Contract will not exceed One Hundred Sixty One Thousand Dollars $161,000.00 (the "Fee"), without the prior written consent of EPCOR, which Fee will be inclusive of all taxes, including federal and provincial sales taxes, customs, duties and excise taxes except any amounts payable in respect of the federal goods and services, the Quebec sales tax and any fully harmonized federal/provincial sales tax. Payment of the Fee is further detailed in Schedule "A".

2. This Contract includes all Purchase Orders issued and the following schedules:
   - Schedule "A" – Description of Services, Payment and Special Provisions; and
   - Schedule "B" – Terms and Conditions
   (all of which is collectively called the "Contract").

3. Unless otherwise specifically indicated in this Contract, all notices, approvals, consents, authorizations or other communications required or permitted by the Contract will be in writing and will be sent to the Contractor or EPCOR, as the case may be, by personal delivery, fax or email to the addresses shown below:

   EPCOR:    EPCOR UTILITIES INC.
             2000 - 10423 - 101 Street NW
             Edmonton, Alberta T5H 0E8
             Attention:   Procurement Department
             Fax:         (780) 412-4992
             Email:       scmprocurement@epcor.com

Schedule "A"

the Contractor:    TMG Utility Advisory Services Inc.
                   DBATMG CONSULTING
                   388 Feathergrass Dr
                   Buda, Texas 78610

                   _____

                   Attention:    Jana Marek
                   Fax:          512-312.9958
                   Email:        Jana.marek@tmgconsulting.com

Either party may change its address or fax number for notices by providing the other party with ten days' notice.

In addition to the foregoing, the parties agree that the Contractor's email address for notices may also be provided on Purchase Orders. Should there be an inconsistency between the Contractor's email address on the Purchase Order and the email address set out in this Article 3, the email address in the Purchase Order will be deemed to have replaced the email address provided in this Article 3 and such email address will be the only email address for notices for the Contractor. In the event there are inconsistencies between Purchase Orders, the email address on the most recent Purchase Order will be deemed the Contractor's email address for the purposes of this Article 3.

4.    The Contractor will not proceed with the Services without prior written authorization by Purchase Order having been given by EPCOR. Claims by the Contractor for Services provided without such authorization will not be valid. The Agreement Number at the top of this Contract and the individual Purchase Order number must appear on all service sheets and invoices provided by the Contractor or payment may be delayed.

5.    EPCOR is under no obligation to exclusively use the Contractor to supply the Services as set out in this Contract.

6.    Subject to earlier termination in accordance with the terms of the Contract or unless EPCOR and the Contractor agree otherwise, the term of this Contract (the "**Term**") will commence on the Effective Date and be completed on the End Date:

| Effective Date: | October | / | 01 | / | 2018 | End Date: | December | / | 31 | / | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | month | | day | | year | | month | | day | | year |

EPCOR shall have the sole option of extending the Term for one (1) year each, upon providing the Contractor with notice within ninety90 days of the End Date of its intention to exercise such option.

7.    Unless otherwise indicated, capitalized words and phrases will have the meanings set out in this Contract. Any capitalized term or expression which is not defined in the Contract will have the ordinary meaning given to it.

8.    This Contract may be executed in any number of counterparts, and may be delivered originally, by facsimile or by Portable Document Format ("**PDF**") and each such original, facsimile copy or PDF copy, when so executed and delivered will be deemed to be an original and all of which taken together will constitute one and the same instrument.

IN WITNESS WHEREOF the parties have duly executed this Contract as of the Effective Date.

**TMG CONSULTING**

Per:

Name:   Mario M. Bauer
Title:    Chief Executive Officer
(I have authority to bind the Contractor)

**EPCOR UTILITIES INC.**

Per:

Name:  David Opalinsky
Title:   Director, Application Services
(I have authority to bind EPCOR)

## SCHEDULE "A"

## DESCRIPTION OF SERVICES, PAYMENT AND SPECIAL PROVISIONS

### A1.   Description of Services

A-1.  For the purposes of this Contract, **"Services"** means the services provided by the Contractor and .et out in the Statement of Work attached to this Contract.

### A2.   Payment

A-2.  In consideration for the Contractor's provision of the Services, and subject to the provisions of this Contract, EPCOR agrees that it will pay the Fee as set out in Statement of Work attached to this Contract (all amounts are inclusive of all taxes, including federal and provincial sales taxes, customs, duties and excise taxes except any amounts payable in respect of the federal goods and services tax, the Quebec sales tax and any fully harmonized federal/provincial sales tax):

### A3.   Invoicing and Payment Procedures

A-3.  The parties agree that the following invoice and payment procedure will be followed:

- All original invoices are to be sent electronically to EPCOR to the following addresses:
  - Accounts Payable - accounts_payable@epcor.com
  - Troy Seitz – tseitz@epcor.com
- Applicable federal goods and services taxes, provincial sales taxes and harmonized federal/provincial sales taxes must be separate line items
- Payment will be made within 30 days of receipt of invoice

### A4.   Special Provisions

A-4.  The parties agree that the following special provisions will apply to the provision of the Services:

### A-4.1 Security

In this section A-4.1, the term "EPCOR Content" means all of EPCOR's data, information, customer data and information residing in EPCOR's Information Technology environment that can be accessed by the Contractor while performing the Services or is provided by EPCOR to the Contractor in electronic format or stored by the Contractor in electronic format.

The Contractor shall inform EPCOR, without unreasonable delay, of an actual or imminent security breach including, but not limited to, unauthorized access or loss of data.  The Contractor shall not modify EPCOR Content, disclose EPCOR Content, or access EPCOR Content, except to address service or technical issues or at EPCOR's request.

The Contractor shall employ measures contained in appropriate technical and organizational measures consistent with those standards to ensure:

    i.   physical and environmental protection of all computing facilities, equipment, and systems on which EPCOR Content is hosted including, but not limited to, communications and network infrastructure, servers, applications, and databases; and

ii.  maintenance of the integrity and safeguarding of EPCOR Content against unauthorized or unlawful access, use, modification, deletion, disclosure, damage, or loss while it is stored, backed-up, and in-transit including, but not limited to, logical and physical access controls and the use of encryption when in transit.

The design of such security measures and their operating effectiveness will be provided to EPCOR upon request and, at minimum, must comply with those standards.

The Contractor shall maintain systems and applications in a manner that ensures they are protected from known vulnerabilities and malware.  This includes, but is not limited to, maintaining, without reasonable delay, firewall, intrusion detection, antivirus protection, security patches, operating system patches and service packs, and application releases to current levels.

Upon termination of this Contract, at the request of EPCOR, the Contractor shall provide to EPCOR all electronic records of EPCOR Content and any and all copies thereof, in a format agreed to by the parties, and shall destroy all extracts, reports, recordings, reproductions and notes thereof.  Upon the request of EPCOR, the Contractor shall certify in writing that it has complied with the obligations set forth in this paragraph and that data has been purged, provided that the Contractor shall not be required to destroy any EPCOR Content which is on backed-up computer records, and provided that all such retained EPCOR Content shall continue to be held by the Contractor subject to this section A-4.1 and the confidentiality provisions in Article B9.  Before destroying any EPCOR Content under this section A-4.1, the Contractor must receive final written acceptance from EPCOR that confirms that EPCOR Content has been received in useable form and EPCOR shall provide this acceptance, or notice that EPCOR Content needs to be resent, within 30 days of receipt of EPCOR Content. Notwithstanding the foregoing, all EPCOR Content will be automatically purged 180 days from the date the portal is retired using data wipe software that implements DoD 5220.22M standards.  Backup tapes taken out of rotation are to be physically destroyed.

# EXHIBIT NO. 7

# PROFESSIONAL SERVICES AGREEMENT
## 202017504

This Professional Services Agreement ("Agreement") is made and entered into as of the 6th day of November, 2020, ("Effective Date") by and between Colorado Springs Utilities ("Utilities") an enterprise of the City of Colorado Springs, a Colorado home rule city and municipal corporation, with its principal place of business at 121 S. Tejon Street, Colorado Springs, Colorado 80903, an TMG Utility Advisory Services, Inc. ("Contractor"), a Texas corporation, with its principal place of business at 388 Feathergrass Drive, Buda TX 78610 each individually a "Party", or collectively the "Parties".

Services shall mean work performed to meet a demand, especially work not connected with a manufacturing process. The furnishing of labor, time, or effort by the Contractor, not involving the delivery of any specific end product, other than reports that are incidental to the required performance.

## Table of Contents

1.  Scope of Work ........................................................................................................... 2
2.  Term ......................................................................................................................... 2
3.  Independent Contractor .......................................................................................... 2
4.  Payment .................................................................................................................... 2
5.  Confidentiality .......................................................................................................... 3
6.  Subcontractors ........................................................................................................ 4
7.  Warranties ................................................................................................................ 5
8.  Indemnification/Liability .......................................................................................... 5
9.  Insurance .................................................................................................................. 6
10. Representatives and Notice ..................................................................................... 6
11. Changes in Work ...................................................................................................... 7
12. Force Majeure .......................................................................................................... 7
13. Dispute Resolution ................................................................................................... 7
14. Appropriation of Funds ............................................................................................ 7
15. Termination .............................................................................................................. 8
16. Copyrights/Intellectual Property ............................................................................ 8
17. Non-Discrimination ................................................................................................ 10
18. Publicity ................................................................................................................. 10
19. Audit ....................................................................................................................... 10
20. Severability ............................................................................................................ 10
21. Assignment ............................................................................................................ 10
22. Compliance with Laws and Regulations ............................................................... 11
23. Security Compliance .............................................................................................. 11
24. Governing Law ....................................................................................................... 12
25. Survival ................................................................................................................... 12
26. Counterparts; Copies of Signatures ...................................................................... 12
27. Time is of the Essence ........................................................................................... 12
28. Entire Agreement ................................................................................................... 12

1. **Scope of Work**
   1.1.     During the term of this Agreement, Contractor shall perform the Services as defined in the specific Statement of Work attached hereto as Exhibit A ("Services").

2. **Term**
   2.1.     With Renewal Options: The term of this Agreement shall be from the Effective Date through August 30, 2021 with four (4) one-year renewal options ("Term") at the sole discretion of Colorado Springs Utilities."

3. **Independent Contractor**
   3.1.     During the Term of this Agreement, Contractor shall act at all times as an independent contractor and shall have the responsibility for and control over the details and means of performing the Services.  Contractor acknowledges it has the duty to provide continuous, adequate supervision of its personnel, consultants and subcontractors, if any.  Nowhere in this Agreement shall it be construed or implied that Contractor or any of its consultants, subcontractors, affiliates, employees, agents, or representatives are employees, representatives, or agents of Utilities.  Contractor shall be subject to the direction of Utilities only with respect to the scope of the services and the general results required.  Contractor shall not make any commitment nor incur any charge or expense in Utilities' name without the prior written approval of Utilities.
   3.2.     Contractor will remain objective at all times and shall have no conflicts of interest.  A conflict of interest exists when there is any personal or financial relationship that could influence or be perceived to influence the representation or conduct of business for, or on behalf of, Utilities.  Any conflict of interest and/or potential conflict of interest will be reported to Utilities in writing within fifteen (15) calendar days from the date of discovery of the conflict of interest/potential conflict of interest.  Contractor shall send the written notice of conflict of interest/potential conflict of interest to the PCS Representative delineated within the Representatives and Notice Section (See Section 10 - Representatives and Notice).

4. **Payment**
   4.1.     Utilities shall pay Contractor for Services performed or furnished in accordance with Contractor's Rates attached as Exhibit B.  Utilities shall pay Contractor for Reimbursable Expenses incurred by Contractor or Contractor's subcontractors as set forth in Exhibit B.  Travel shall be pre-approved by Utilities in writing; lodging, meals and incidental expenses in accordance with Utilities' Contractor Travel Reimbursement Policy attached as Exhibit T.
   4.2.     Invoices will be prepared in a manner acceptable to Utilities by Contractor.  Invoices must be mailed, faxed or emailed to the address(s) listed below and shall be in a protected format that cannot be altered.
   4.3.     Each invoice shall be accompanied by supporting documentation as required by Utilities.  Utilities, a governmental entity, is exempt from taxes per Federal Tax ID # 84-600574.  Original invoices for payments shall be submitted one of three ways:

   - **US Mail:**
     **Accounts Payable – MC 929**
     **Colorado Springs Utilities**
     **PO Box 1103**
     **Colorado Springs, Colorado 80947-0929**

(1/2020)

- **Email:** accountspayablemail@csu.org
- **Fax:**        719-668-8600

4.4.  Unless otherwise stated in this Agreement, a copy of each invoice, duly marked "COPY", shall be sent directly to the project manager or contract administrator as identified in this Agreement or as otherwise advised in writing.

4.5.  Net Payment of undisputed invoices is due and payable Net Thirty (30) days of Utilities' receipt of a complete and accurate invoice, notwithstanding anything that may be printed on such invoice. These payment terms shall also be subject to discounts for prompt payment, if any, as set forth in Exhibit B, or any other applicable discounts offered by Contractor for any reason, including the terms of any applicable price warranty. Payment by credit card, "P-card," or electronic funds transfer is a means of remitting payment only and shall not be construed as limiting Utilities' rights or altering any of the terms or conditions incorporated into this Purchase Agreement. In the event Utilities disputes or contests all or any part of any invoice, Utilities reserves the right to request a replacement invoice stating only the undisputed amount, and to promptly pay any undisputed amount and to withhold payment of any disputed amount, without waiving any of its claims or defenses to payment of the disputed amount. In the event that Contractor issues a replacement invoice for any undisputed amount, it is agreed that such issuance of a replacement invoice does not constitute a waiver of Contractor's rights with regard to the disputed amount.

4.6.  Utilities is committed to paying invoices within the terms of the Agreement. Utilities will not pay any late charges or service charges that may be incurred due to late payment.

4.7.  In the event of any termination Contractor will be entitled to invoice Utilities and will be paid in full for all Services accepted and all reasonable reimbursable expenses incurred through the effective date of termination. In the event of termination by Utilities for convenience, Contractor shall be entitled to invoice Utilities and shall be paid a reasonable amount for Services and expenses directly attributable to termination, such as reassignment of personnel, costs of terminating contracts with Contractor's subcontractors, and other related close-out costs, using methods and rates for additional Services as set forth in this Agreement.

## 5. Confidentiality

5.1.  Contractor acknowledges that Utilities is a public entity subject to the provisions of the Colorado Public Records Act, C.R.S. § 24-72-201 et seq. Any confidential and/or proprietary information that either party discloses to the other with respect to this Agreement shall be designated as confidential and proprietary by the disclosing party at the time of disclosure, and shall herein be referenced as "Confidential Information".

5.2.  In the course and scope of the Services being performed under this Agreement, Contractor may be provided, including by way of presence on Utilities' premises or by use of or access to Utilities' computer system, access to information that is Utilities' Customers' information. Customers' information includes, but is not limited to names, addresses, telephone numbers, or personal financial information of past or present users of Utilities. All Customers' information is deemed Confidential Information, whether it is marked or not, notwithstanding any other provision of this Agreement. In addition to the above Contractor acknowledges that Utilities is subject to the provisions of the Fair and Accurate Credit Transactions Act of 2003 ("FACT Act"), 15 U.S.C. § 1681 et seq. and when applicable shall comply with Fact

(1/2020)

Act rules. Contractor agrees that it shall not use, commercialize or disclose such Confidential Information to any person or entity, except to its own employees or Utilities-authorized subcontractors having a "need to know" to the extent and for the time necessary to performance of this Agreement. Furthermore, Contractor shall burn, pulverize, or shred papers and destroy or erase all electronic media that contain Utilities' customer Confidential Information upon termination of this Agreement or completion of the Services, whichever is sooner, or such other time(s) as may be specified in the Statement of Work so that such Confidential Information cannot practically be read or reconstructed. Utilities has the right, but not the obligation, to audit Contractor compliance with this Section 5 "Confidentiality" by providing Contractor written notice 24 hours in advance of such audit.

5.3. The recipient shall not engage in any use or disclosure of Confidential Information not expressly provided for in this Agreement. In the event either Party receives a request for such Confidential Information from a third party, notice thereof shall promptly be given to the other Party. The recipient shall take all reasonable steps to prevent any unauthorized possession, use, transfer or disclosure of such Confidential Information. Should the recipient learn of any such unauthorized possession, use, transfer or disclosure, it shall promptly notify the other Party. If requested, the recipient shall deliver to the other Party all Confidential Information (including all copies) disclosed to it with respect to this Agreement. All items of intellectual property governed by federal patent or federal copyright laws and received by Utilities from Contractor shall be treated as property and not as information, if they are marked as such. Thus, engineering drawings and software code, among other things normally subject to such patent or copyright laws, shall be considered intellectual property received under license or such other arrangement as may appear from any applicable contract documents and is not information or a record that is subject to disclosure in response to a request under CORA, whether or not marked as confidential.

5.4. The disclosure provisions of this section shall not apply to information that a) the Parties had in their possession prior to disclosure by the other Party; b) becomes public knowledge through no fault of the recipient; c) the recipient lawfully acquires from a third party not under an obligation of confidentiality to the disclosing Party; or d) is required to be disclosed by law or court order.

5.5. Contractor shall not disclose any such Confidential Information or documents to any third party without the prior written authorization of Utilities.

6. **Subcontractors**

6.1. Contractor may retain subcontractors to carry out the Services outlined in this Agreement. Utilities reserves the right to approve all subcontractors prior to their use by Contractor. There shall be no relationship, fiduciary or otherwise, between Utilities and the subcontractors hired by Contractor. Contractor shall ensure that all subcontractors retained by Contractor acknowledge this Agreement, including the confidentiality provisions, in writing.

6.2. Contractor shall be fully responsible to Utilities for all acts and omissions of the subcontractors, suppliers, and other individuals or entities performing or furnishing any of the Services just as Contractor is responsible for Contractor's own acts and omissions. Nothing in the contract documents shall create for the benefit of any such subcontractor, supplier, or other individual or entity any contractual relationship between Utilities and any such subcontractor, supplier, or other individual or

entity, nor shall it create any obligation on the part of Utilities to pay or to see to the payment of any moneys due any such subcontractor, supplier, or other individual or entity except as may otherwise be required by laws and regulations.

6.3. All Services performed for Contractor by a subcontractor or supplier will be pursuant to an appropriate agreement between Contractor and the subcontractor or supplier, which specifically binds the subcontractor or supplier to the applicable terms and conditions of this Agreement for the benefit of Utilities.

## 7. Warranties

7.1. Contractor agrees to perform Services with the same degree of care, skill and diligence as is ordinarily possessed and exercised in the same profession under similar circumstances and shall ensure that its subcontractors, if any, have the level of skill in the area commensurate with the requirements of the Services to be performed. Contractor shall at all times attempt to serve the best interests of Utilities in connection with such Services and shall advise Utilities when Services it requests are not in Utilities' best interests.

7.2. If it is shown within twenty-four (24) months of completion of the Services that Contractor or its subcontractors committed an error in the performance of the Services or that normal standards of care and diligence have not been met, and Utilities promptly notifies Contractor of such an error or deficiency, Contractor shall perform corrective Services at no cost to Utilities as may be necessary to remedy the error or deficiency. If Contractor does not promptly comply with the terms of such instructions, or in an emergency where delay would cause serious risk of loss or damage, Utilities may have the corrective Services performed by a third party, and all costs, losses, and damages arising out of or relating to such correction will be paid by Contractor.

7.3. Contractor warrants that all Services will meet applicable Utilities' specifications and agrees to correct deficiencies in any Services performed, in whole or in part, by the Contractor, which Utilities can demonstrate does not meet the applicable Utilities specifications, provided written notice is given to Contractor within two (2) years.

7.4. Contractor warrants that it is the lawful owner or licensee of any software programs or other proprietary materials used by Contractor in the performance of the Services called for in this Agreement and has all rights necessary to grant to Utilities any licenses necessary to use any equipment or intellectual property installed or specified by Contractor.

7.5. Contractor shall obtain from all suppliers and manufacturers any and all warranties and guarantees of such suppliers and manufacturers received for any products obtained on behalf of Utilities as part of Contractor's performance of this Agreement, whether or not specifically required by the Statement of Work, and shall assign such warranties and guarantees to Utilities.

7.6. Contractor shall warrant that all products obtained on behalf of Utilities for the purpose of performing this Agreement shall have warranties that are transferable to Utilities and shall transfer all such warranties to Utilities.

## 8. Indemnification/Liability

8.1. To the fullest extent permitted by law, Contractor hereby releases Utilities and shall fully protect, defend, indemnify and hold harmless Utilities, the City of Colorado Springs, their officers, City Council, Utilities Board, directors, employees, agents and representatives from and against any and all claims, costs (including but not

limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or other dispute resolution costs), losses, damages, causes of action, or liability of any nature to the extent caused by the willful misconduct or negligent, reckless or tortious acts or omissions of Contractor or anyone for whose acts Contractor may be liable in the performance of its obligations under this Agreement.

8.2. Contractor will indemnify Utilities against a claim that any Service, as provided by Contractor to Utilities and used within the scope of this Agreement, infringes any copyright or any United States patent or trademark, or incorporates any misappropriated trade secret (a "Claim"). Contractor will pay any liabilities, costs, damages, or expenses, including reasonable attorneys' fees, attributable to such a Claim that are incurred by Utilities and/or awarded against Utilities in a final judgment or settlement approved in advance and in writing by Contractor, provided that Utilities notifies Contractor in writing within thirty (30) days of the Claim.

8.3. Nothing in this Agreement shall be interpreted to limit or prevent the protections afforded to Utilities or the City of Colorado Springs under the Colorado Governmental Immunity Act, C.R.S. § 24-10-101, et seq.

## 9. Insurance

9.1. See Exhibit I, "Insurance Requirements."

9.2. The types and amounts of insurance required under this Agreement or any exhibit attached hereto do not in any way limit the liability of the Contractor, including under any warranty or indemnity provision of this Agreement, or any other obligation whatsoever Contractor may have to Utilities or others.

9.3. Nothing in this Agreement or any exhibit attached hereto limits Utilities' access to the minimum required types and limits of insurance found in Exhibit I, "Insurance Requirements."

## 10. Representatives and Notice

10.1. Utilities may appoint a representative to act as liaison with Contractor in accordance with Exhibit A. Utilities' representative may be changed upon prior written notice to Contractor. All notices necessary or required under this Agreement shall be in writing and shall be personally delivered, sent by overnight delivery service, or mailed by certified mail, postage prepaid and return receipt requested, as follows:

If to Utilities:

Colorado Springs Utilities
Attn: Procurement and Contract Services Manager
PO Box 1103, MC 920
Colorado Springs, CO 80947-0920
Phone: 719-668-2630

If to Contractor:

TMG Consulting
Attn: Mario Bauer
388 Feathergrass Drive
Buda, TX, 78610
Phone: 720-244-1183

(1/2020)

10.2. Notice given by personal delivery, overnight delivery, or mail shall be effective upon actual receipt. The Parties may change any address to which notice is to be given by giving notice as provided above of such change of address.

## 11. Changes in Work

11.1. Changes in Work. Subject to Section 14.3, Appropriation of Funds, any request by either Party for additional work or for changes in the manner or method of work performance, shall be made only by written amendment, which shall specify the part of the Agreement affected by the change. Utilities shall not be liable for payment of any additional work performed by Contractor not previously authorized by Utilities by written amendment.

## 12. Force Majeure

12.1. Neither Party shall be liable for delays in performing its obligations to the extent the delay is caused by an unforeseeable condition beyond its reasonable control without fault or negligence including strikes, riots, wars, floods, fires, explosions, acts of nature, acts of government (other than the Colorado Springs City Council), or labor disturbances.

## 13. Dispute Resolution

13.1. If a dispute arises between the Parties relating to this Agreement, the procedure below shall be followed:

13.1.1. The Parties shall hold a meeting promptly, but in no event later than thirty (30) calendar days from the initial written notice of the dispute, attended by persons with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the dispute; provided, however, that no such meeting shall be deemed to vitiate or reduce the obligations and liabilities of the Parties hereunder or be deemed a waiver by a Party hereto of any remedies to which such Party would otherwise be entitled thereunder unless otherwise agreed to by the Parties in writing.

13.1.2. If, within thirty (30) calendar days after such meeting, the Parties have not succeeded in negotiating a resolution of the dispute, they agree to submit the dispute to non-binding mediation and to bear equally the costs of the mediation.

13.2. The Parties will jointly appoint a mutually acceptable mediator. If they fail to do so within twenty (20) calendar days from the conclusion of the negotiation period, they shall each select a mediator. The two mediators will then appoint a third mediator who shall, as the sole mediator, conduct mediation for the Parties. The Parties agree to participate in good faith in the mediation and negotiations related thereto for a period of thirty (30) calendar days. The substantive and procedural law of the State of Colorado shall apply to the proceedings. If the Parties are not successful in resolving the dispute through mediation, then the Parties shall be free to litigate the matter, and agree that in the event of such litigation, the exclusive venue for such litigation shall be the El Paso County District Court, Colorado Springs, Colorado, and if necessary, for exclusive federal questions, the United States District Court for the District of Colorado.

## 14. Appropriation of Funds

14.1. This Agreement is expressly made subject to the limitations of the Charter of the City of Colorado Springs. Nothing herein shall constitute, nor be deemed to

constitute, the creation of a debt or multi-year fiscal obligation or an obligation of future appropriations by the City Council of Colorado Springs or any other constitutional, statutory, or charter debt limitation. Notwithstanding any other provision of this Agreement, with respect to any financial obligations of Utilities which may arise under this Agreement in any fiscal year after the year of execution, in the event the budget or other means of appropriation for any such year fails to provide funds in sufficient amounts to discharge such obligation, such failure (i) shall act to terminate this Agreement at such time as the then-existing and available appropriations are depleted, and (ii) neither such failure nor termination shall constitute a default or breach of this Agreement, including any sub-agreement, attachment, schedule, or exhibit thereto, by Utilities.

## 15. Termination

15.1. The following conduct shall be deemed to be a default of Contractor under this Agreement:

15.1.1. The Services under this Agreement are abandoned by Contractor; or

15.1.2. The Agreement is assigned by Contractor without the written consent of Utilities; or

15.1.3. Contractor is adjudged bankrupt; or

15.1.4. A general assignment of Contractor's assets is made for the benefit of its creditors; or

15.1.5. A receiver is appointed for Contractor or any of its property; or

15.1.6. At any time Utilities sends notice that the performance of the Services under this Agreement is being unnecessarily delayed, that Contractor is violating any of the conditions of this Agreement or that Contractor is executing the same in bad faith or otherwise not in accordance with the terms of said Agreement; or

15.1.7. The Services are not substantially completed within the time named for its completion.

15.2. Upon default, Utilities may send written notice upon Contractor of Utilities' intention to terminate this Agreement. If Contractor agrees to corrective action, then Contractor will have an additional five (5) calendar days to develop a corrective action plan acceptable to Utilities for completion of the services. If Contractor fails to complete the previous two activities within the prescribed times, or if Contractor fails to complete the services pursuant to the corrective action plan, then Utilities may terminate this Agreement without further notice to Contractor. In the event of such termination, Utilities may take over and prosecute the services to completion, by contract or otherwise. Contractor shall be liable to Utilities for all reasonable costs sustained by Utilities by reason of such prosecution and completion.

15.3. This Agreement may be terminated for convenience regardless of default by Utilities upon thirty (30) days advance written notice to Contractor. Contractor shall not be paid for any Services performed after the date of termination, unless otherwise mutually agreed upon by the Parties in writing.

## 16. Copyrights/Intellectual Property

16.1. Contractor agrees that Utilities will have extensive input in the process of rendering Services associated with this Agreement. Therefore, Contractor agrees and acknowledges that all work produced as a result of the Services (e.g. video, artwork, brochures, covers, labels, writings, designs, models, etc.) that have been or will be used by or paid for by Utilities, pursuant to this Agreement is a work made for hire as that term is defined by the United States copyright laws, but within full

control of Utilities, and that Utilities is the sole owner of any work product which Contractor has made or will make under this Agreement, including but not limited to all intellectual property rights in said work product under copyright, patent, trademark, trade secret and other applicable law, and that compensation to Contractor for acceptance and acknowledgement of this Agreement is included in any compensation or price whatsoever paid to Contractor. It is the intent of the Parties that Utilities shall have full ownership of the work product produced pursuant to this Agreement upon payment in full by Utilities to Contractor.

16.2.    Contractor hereby warrants to Utilities that it will take no action to copyright, patent, trademark, or trade secret any and all of the work product described in this Agreement.

16.3.    In the event this Agreement is deemed by a court of competent jurisdiction not to be a work for hire under federal copyright laws, this Agreement provision shall act as an irrevocable disclaimer by Contractor in favor of Utilities and as an irrevocable assignment to Utilities by Contractor of any and all intellectual property rights in Contractor's work product, including, but not limited to, copyright, patent, trademark and trade secrets, including, but not limited to, all rights in perpetuity. Under this irrevocable assignment, Contractor hereby assigns to Utilities the sole and exclusive right, title, and interest in and to Contractor's work product, in any and all countries. It is Contractor's specific intent to assign all right, title, and interest whatsoever in any media and for any purpose, to Utilities, including all rights of renewal and extension. To that end, Contractor agrees to execute and deliver all necessary documents requested by the City of Colorado Springs and/or Utilities in connection therewith and appoints City of Colorado Springs and/or Utilities as Contractor's agent and attorney-in-fact to act for and in Contractor's behalf and stead to execute, register and file any such applications, and to do all other lawfully permitted acts to further the registration, prosecution, issuance, renewals, and extensions of copyrights or other protections with the same legal force and effect as if executed by Contractor. Further, the Parties expressly agree that the provisions of this paragraph shall be binding upon the Parties and their legal representatives, successors, and assigns.

16.4.    Royalties and fees for patents covering materials, articles, apparatus, devices, or equipment (as distinguished from processes) used in the work or Services, shall be included in the hourly rate amounts paid to Contractor in accordance with Exhibit B. No additional compensation shall be due to Contractor for such items. Contractor shall satisfy all demands that may be made at any time for such royalties or fees and they shall be liable for any damages or claims for patent infringements. Contractor shall, at its own cost and expense, defend all suits or proceedings that may be instituted against Utilities and hold Utilities harmless for infringement or alleged infringement of any patents involved in the work and, in case of an award, including any costs and attorney fees awarded, and any and all costs and attorney fees associated with any appeals that may be taken from any judgment rendered on any such suits or proceedings of damages, Contractor shall pay such award provided Utilities gives Contractor prompt notice in writing of such claim and permits Contractor to contest same through its counsel or, at its option, to settle by securing for Utilities the right to continue to use such products or by modifying them to avoid infringement, or by reclaiming them and reimbursing Utilities the sum paid therefore; and provided Utilities gives Contractor all necessary authority and assistance, at the expense of Contractor, to enable Contractor to do so. Final payment to Contractor by Utilities will not be made while any suit or claim remains unsettled.

## 17. Non-Discrimination

17.1. Utilities is committed to equal employment opportunity for all and maintains and implements equal opportunity and affirmative action where necessary in all of its daily operations. Utilities is a federal subcontractor and an affirmative action employer subject to the Vietnam Era Veterans' Readjustment Assistance Act of 1974, Jobs for Veterans Act, as amended, and Section 503 of The Rehabilitation Act of 1973, as amended. Contractor and subcontractor(s) with whom Utilities contracts may be obliged to undertake Affirmative Action to provide equal employment opportunity without regard to race, color, religion, national origin, sex, veteran status or disability. Additional obligations may be imposed on Contractor and subcontractor(s) with whom Utilities contracts by the above-cited Executive Order and federal statutes.

17.2. Contractor and all subcontractor(s) shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a), and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or individuals with disability.

## 18. Publicity

18.1. Contractor and Utilities shall not at any time use the name, trademark(s) or trade name(s) of the other in any advertising or publicity without the prior written consent of the other.

## 19. Audit

19.1. Contractor shall maintain accurate records of all amounts billable to and payments made by Utilities hereunder in accordance with recognized accounting practices and in a format that will permit audit, for a period of three (3) years after payment of the last invoice related to this Agreement. Such records shall be open to reasonable inspection and subject to audit and/or reproduction, during normal working hours, by Utilities or its authorized representative. Utilities shall give Contractor advance notice of intended audits.

## 20. Severability

20.1. If any provision of this Agreement shall be found to be illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect, and such term or provision shall be deemed stricken for as long as it remains illegal or unenforceable.

## 21. Assignment

21.1. Neither Party may assign or transfer any part of this Agreement without the written consent of the other Party, except to an affiliate but only if (a) the assignee agrees in writing to be bound by the terms of this Agreement and (b) the assigning Party remains liable for obligations under the Agreement. Any other attempt to transfer or assign is void.

21.2. Upon a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), (a) the Party experiencing the change of control will provide written notice to the other Party within 30 days after the change of control, and (b) the other Party may immediately terminate this Agreement any